## MERCHANTS' NATIONAL BANK, RESPONDENT, *v.* GREENHOOD ET AL., APPELLANTS.

[Submitted June 24, 1895.   Decided July 22, 1895.]

FRAUD—*Evidence.*—It is often that fraud cannot be proved by direct evidence, and where its existence is the main issue in an action, a wide latitude of evidence is therefore allowed in order that it may be detected and exposed.

SAME—*Same—Findings.*—Although the appellate court may not be wholly satisfied as to the evidence of fraud in conveyances by a defendant assignor to third parties, and as to the participation in such fraud by the assignee, yet, where there is as ample evidence as in this case to support the findings of the jury in these respects the verdict will not be disturbed.

DISTRICT COURT—*Docket—Trial of cases.*—A district court has the right to control its own docket and determine the order in which cases may be tried.

EQUITY—*Action to avoid fraudulent assignment—Remedy at law.*—Equity will aid a creditor who has obtained a judgment at law to reach the property of his debtor by removing fraudulent obstructions to the levy of execution thereon, and where a creditor, who has obtained a judgment in an action brought subsequent to an assignment by his debtor, seeks to levy an execution upon the property in the hands of the assignee, and upon which he had obtained a lien by attachment, and the sheriff returns upon the execution that no property is found to satisfy the execution except the property attached and which is embraced in an alleged assignment, wherefore the execution is returned unsatisfied, the creditor may maintain a bill in equity to remove such obstruction upon a showing that the transaction was fraudulent.   Nor is it enough in such case that there is a remedy at law, but it must be as practical and efficient to the prompt administration of justice as the remedy in equity, which would not be the case, where, if the plaintiff resorted to his legal remedy and sold the property, a number of suits would be required before all claims were adjudicated, some of which would have to be finally settled in equity, while an equity action to avoid the assignment brings all parties before the court for the final determination of their rights.

ATTACHMENT—*Abandonment of lien.*—Abandonment is a question of intent, and where the acts of a plaintiff clearly indicate that he has no intention of abandoning an attachment lien, the mere issuance of an execution and its being returned unsatisfied, does not operate as an abandonment.

NEW TRIAL—*Harmless error.*—The admission, on the trial of a suit in equity to have an assignment declared fraudulent, of a conversation between the plaintiff and one of the defendant assignors, occurring after the assignment had been made, in which the latter stated that they had hoped to borrow money and make a settlement with their creditors, but were prevented by plaintiff's action, if error, was not of such a prejudicial nature as to warrant a reversal of the case.

EQUITY—*Purchaser for valuable consideration—Fraud of assignee.*—An assignee in trust for the benefit of creditors is not a purchaser for a valuable consideration within section 232, Fifth Division of the Compiled Statutes, excluding a purchaser for a valuable consideration, without notice of the fraudulent intent of his grantor, from the operation of section 229, Id., declaring void every conveyance or assignment made with the intent to hinder, delay or defraud creditors, and therefore, in an action to have an

assignment declared fraudulent, it is sufficient to establish the fraud of the assignor without showing that the assignee participated therein.

APPEAL—*Rehearing.*—A motion for a rehearing, not made until after the remittitur has been issued, to consider a point presented for the first time on such motion, will be denied, where the record was on file for seventeen months before the appeal was heard, voluminous briefs had been filed and counsel were allowed more than double the time for argument then the rule prescribes. (*Columbia Mining Company* v *Holter*, 1 Mont. 429; *Davis* v. *Clark*, 2 Mont. 394, cited.)

*Appeal from First Judicial District, Lewis and Clarke County.*

ACTION to have an assignment declared fraudulent. The cause was tried before HUNT and BUCK, JJ., sitting concurrently. Judgment was rendered for the plaintiff below. Affirmed.

Statement of the case by the justice delivering the opinion.

The nature of this action will appear fully by the complaint therein, which pleading we have deemed best to insert in this statement in full. After the close of the trial, the court allowed the plaintiff to amend its complaint. The complaint, as finally amended under that order, is as follows:

"Now comes the plaintiff, and by leave of court first had and obtained, files this its second amended complaint, and complains on behalf of itself and all others, the judgment creditors of Greenhood, Bohm & Co., who are parties to a certain deed of assignment hereinafter mentioned, and who shall come in and seek relief by and contribute to the expense of this action, and alleges that the subject of this investigation is of common and general interest to all of said creditors under the said deed of assignment. Wherefore the plaintiff sues for the benefit of all, and alleges:

"I. That it is now, and was at all the times hereinafter mentioned, a banking corporation, organized and existing under and by virtue of the banking laws of the United States, and doing business in the city of Helena, Montana, and elsewhere.

"II. That the defendants Isaac Greenhood and Ferdinand Bohm are now, and were at all the times hereinafter men-

tioned, copartners, doing business in the city of Helena and elsewhere under the firm name and style of Greenhood, Bohm & Co.

"III. (1) That on the 13th day of February, 1892, an action was duly commenced by said plaintiff against said defendants Isaac Greenhood and Ferdinand Bohm, the copartners hereinbefore referred to, doing business under the firm name and style of Greenhood, Bohm & Co., in the district court of the First judicial district of the state of Montana, in and for the county of Lewis and Clarke, in department No. 1 of said court, by the filing of a complaint and the issuance of a summons, for the recovery of a judgment for the sum of $20,000, together with interest thereon at the rate of 10 per cent. per annum from the 27th day of November, 1891, and for the sum of $13,500, with interest thereon at the rate of 10 per cent. per annum from the 19th day of November, 1891, and for the sum of $1,000, with interest thereon at the rate of 10 per cent. per annum from the 16th day of January, 1892, upon certain demand notes made, executed, and delivered by the copartnership of Greenhood, Bohm & Co. to this plaintiff.

"(2) That on said date a writ of attachment was duly issued in due form in said last named action, after the issuance of the summons therein, and placed in the hands of the sheriff of Lewis and Clarke county for execution.

"(3) That on the 15th day of February, 1892, the sheriff, by virtue of the power and authority vested in him as such officer, and under and by virtue of said writ of attachment, did levy upon and seize and take into his possession that certain stock of goods, wares, and merchandise, situate and being in that certain store building on South Main street, in the city of Helena, known and designated as No. 24, and by garnishment levied said attachment upon all the money and other property and effects of said Greenhood, Bohm & Co. in the hands of the defendant Max Kahn, assignee.

"(4) That thereafter, on the 8th day of April, 1892, judgment was duly rendered and entered in said last-named action in said district court, in favor of the plaintiff herein and

against said Isaac Greenhood and Ferdinand Bohm, copartners, etc., for the sum of $35,945.48.

"(5) That thereafter, to wit, on the —— day of April, 1892, an execution was duly issued on said judgment against the property of said defendants Isaac Greenhood and Ferdinand Bohm, copartners aforesaid, addressed to the sheriff of the county of Lewis and Clarke, state of Montana, in which county said defendants resided, and was by said sheriff returned as follows, to wit: 'No property to be found in my county to satisfy the foregoing execution, except the property attached herein and embraced in an alleged assignment of Greenhood, Bohm & Co. to Max Kahn, on the 12th day of February, 1892, and except the above garnishments, and I herewith return said execution unsatisfied.'

"IV. That, after the contracting of the indebtedness for which the aforesaid judgment was recovered, the said defendants Isaac Greenhood and Ferdinand Bohm made, executed, and delivered to the said defendant, Max Kahn, a fraudulent, fictitious, and pretended assignment for the benefit of their creditors of all their property, a copy of which assignment is hereto attached, and marked 'Exhibit A,' and made a part of this complaint.

"V. That the said Max Kahn accepted the said pretended, fraudulent, and fictitious trust, and now claims all of the property of the said defendants Isaac Greenhood and Ferdinand Bohm under and by virtue of said fraudulent, fictitious, and pretended assignment, including the property levied upon and seized by the sheriff under said writ of attachment, as aforesaid.

"VI. That said Max Kahn has collected a large sum of money from the assets of said pretended assignors, amounting in all to over the value of $7,000.

"VII. That the said pretended, fraudulent, and fictitious assignment so made and executed by the said Isaac Greenhood and Ferdinand Bohm, copartners under the firm name and style of Greenhood, Bohm & Co., on the 12th day of February, 1892, as aforesaid, was made, executed, and delivered by the said defendants Isaac Greenhood and Ferdinand Bohm for the

purpose and with the intent to hinder, delay, and defraud this plaintiff and the other creditors of said copartnership.

"VIII. That said assignment, and the said claim of the said defendant Max Kahn to the property of the defendants Isaac Greenhood and Ferdinand Bohm are fraudulent, fictitious, and pretended, because of the facts hereinafter stated, to wit:

"(1) The want of sufficient description of the property herein attempted to be conveyed, in that the following is the whole of the descriptive part of the said assignment, to wit: 'All and singular his goods, wares, and merchandise, bills, notes book accounts, claims, demands, accounts, choses in action, evidences of debts, stock, and property, both real and personal, of every name, nature, and description and wherever situated, including the list of stock of boots and shoes, clothing, gents' furnishing goods, notions, whiskey, and cigars, and general merchandise, book accounts, notes, etc., of the business carried on by them at their store on Main street, Helena, Montana;' that said defendant copartnership was the owner of real estate at the time of said assignment, situated in the city of Seattle, state of Washington, worth about $4,000, and no such description is made of such real estate that the title to the same could pass to the assignee.

"(2) That at the time of said assignment said defendant copartnership was the owner of a stock of goods situated in No. 11 Lispenard street, in the city of New York, state of New York, of the value of about $4,500, and no reference is made to said stock of goods in the said assignment, except the general description, 'all property, both real and personal, of every name, nature, and description, and wherever situated.'

"(3) That the aforesaid imperfect description of the property owned by the defendants at the time of the said assignment was not aided by any schedules of the property attached to the same at the time of the execution thereof or since.

"(4) That at the time of the execution of said assignment by the defendants Greenhood and Bohm, and long prior thereto, the said defendants were carrying on business in the city of New York, and also in the city of Helena, Montana,

under the firm name and style of Greenhood & Bohm in New York, and Greenhood, Bohm & Co. in Helena; that these several names were adopted for convenience in transacting business in said city of Helena, and said city of New York, but that it was one and the same copartnership.

" (5) That the laws in the state of Washington in relation to the assignment of property for the benefit of creditors provide as follows, to wit :   Laws 1889–90, page 83,—an act relating to estates of insolvent debtors:   ' An act to secure creditors a just division of the estates of debtors who convey to assignees for the benefit of creditors.   Section 1.   No general assignment of property by an insolvent, or in contemplation of insolvency, for the benefit of creditors, shall be valid unless it be made for the benefit of all his creditors, in proportion to the amount of their respective claims.   And such assignment shall have the effect to discharge any and all attachments on which judgment shall not have been taken at the date of such assignment; and after payment of the costs and disbursements thereof, including the attorney's fee allowed by law in case of judgment, out of the estate of the insolvent, and claim or claims shall be deemed as presented, and shall have *pro rata* with other claims, as hereinafter provided.   *   *   *   Section 3. The debtor shall annex to such assignment an inventory, under oath, of all his estate, real and personal, according to the best of his knowledge, and also a list of his creditors, with their post-office addresses, and a list of the amount of their respective demands, but such inventory shall not be conclusive as to the amount of the debtor's estate.'   The said assignment, executed by said defendants Greenhood & Bohm to said defendant Max Kahn, would not pass title, even if the description had been sufficient, to the said lands in Seattle, Washington, for the reason that the same prefers one class of creditors over another, contrary to the provisions of the laws of the state of Washington touching such assignment.

" (6) That, at the date of the said pretended assignment, the said defendants Isaac Greenhood and Ferdinand Bohm were,

as plaintiff is informed and believes, individually indebted in large sums to divers and sundry persons.

"(7) That said pretended assignment provides for the payment of the individual indebtedness of the said defendants Isaac Greenhood and Ferdinand Bohm before all of the indebtedness of the copartnership of Greenhood, Bohm & Co. is paid and satisfied.

"IX. And plaintiff further alleges that said assignment was made for the purpose and with the intent of hindering, delaying and defrauding this plaintiff and the other creditors of the said copartnership in the collection of their just debts, and in support of this allegation plaintiff sets forth and alleges the following facts, to wit:

"(1) The value of the stock of goods, situated in Helena, conveyed in said deed of assignment, together with the book accounts and bills receivable, which were taken possession of at the time of the said assignment by the said defendant Max Kahn, assignee, will not exceed in value the sum of $75,000. That the total indebtedness of said copartnership exceeds the sum of $250,000. Of this there is placed in the preferred class about the sum of $140,000, so that the amount of the assets taken possession of by the assignee, the said defendant Max Kahn, after paying the expenses of said assignment and their collection and disbursement, would not pay upon said preferred debts exceeding 40 per cent.

"(2) That the said Max Kahn, the assignee mentioned in the said deed of assignment, did not take possession of the stock of goods situate in the city of New York, nor attempt to do the same, and has not yet taken possession of the same, as plaintiff is informed and believes, and did not intend to take possession of the same, nor was it intended by said Greenhood and Bohm that he should. The law of New York upon the subject of taking possession of property which has been assigned, is as follows, to wit:   4 Rev. St. N. Y. (8th Ed.) title 11, page 2591, § 5 :   'Every sale made by a vendor of goods and chattels in his possession, or under his control, and every assignment of goods and chattels, by way of mortgage or security,

or upon any condition whatever, unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession of the things sold, mortgaged or assigned, shall be presumed to be fraudulent and void, as against the creditors of the vendor, or the creditors of the persons making such assignment, or subsequent purchasers in good faith; and shall be conclusive evidence of fraud unless it shall be made to appear on the part of the persons claiming under such sale or assignment, that the same was made in good faith, and without intent to defraud such creditors or purchasers.'   Section 6 :   ' The term " creditors," as used in the last section, shall be construed to include all persons who shall be creditors of the vendor or assignor or at any time whilst such goods and chattels shall remain in his possession or under his control.'

" (3) That the defendants Greenhood and Bohm place one Caroline Westheimer in the preferred class for $2,500, when, as plaintiff is informed and believes, said defendants did not owe said Caroline Westheimer exceeding the sum of $2,374.

" (4) That one Col. Morse is made a preferred creditor for the sum of $3,500, when said indebtedness is not an indebtedness of the firm of Greenhood, Bohm & Co., but the individual indebtedness of the defendant Isaac Greenhood, and was falsely and fraudulently placed in the class of preferred creditors of the said copartnership for the purpose of hindering and defeating the plaintiff and other creditors of said copartnership from the collection of their just claims.

" (5) That the defendants Greenhood and Bohm, as the plaintiff is informed and believes, had in their possession at the time of said assignment, and have now, a large sum of money and a large quantity of goods, aggregating many thousands of dollars, and other property which they did not surrender to the assignee, and which they are fraudulently concealing for the purpose of defrauding and defeating the plaintiff and other creditors from the collection of their just debts; that said Max Kahn, the alleged assignee named in said assignment, one of

the defendants herein, was and is a party to said fraudulent concealment, and knew, as plaintiff is informed and believes, that said goods were fraudulently removed from the stock of goods in Helena, Montana, and elsewhere, and that said money was fraudulently withheld for the purpose of concealing the same, and hindering, delaying and defrauding the creditors of the said defendants Greenhood and Bohm; that, at the time of the said assignment, said defendant Kahn was the assistant bookkeeper of Greenhood, Bohm & Co., and the confidential agent of the said Greenhood and Bohm, and was made the assignee for the purpose of being used by the said Greenhood and Bohm in the fraudulent concealment of a portion of the assets of said copartnership, as above set forth.

"(6) That said defendant Greenhood conveyed by deed of mortgage to one I. Weil lots 2 and 3, in block 18, of the Story addition to the city of Helena, for the alleged purpose of securing a note of even date therewith, for $2,500, which note is as follows, to wit : ' $2,500.00.    Helena, Montana, February 11, 1892.    Two years after date I promise to pay to Ignatz Weil, or order, twenty-five hundred dollars, for value received, negotiable and payable, without defalcation or discount, at the Traders' National Bank, Spokane, Washington, with interest at the rate of six per cent. per annum from date until paid.    [Signed]    Isaac Greenhood.'    That said mortgage was filed for record in the recorder's office of Lewis and Clarke county, Montana, on the 12th day of February, 1892, at the hour of 8:50 o'clock p. m. of said day; that said assignment, marked 'Exhibit A' herein, was filed for record in said office at 9:03 o'clock p. m. of the 12th day of February, 1892; that both said instruments were filed by the defendant Max Kahn, and at his request said mortgage was filed before said assignment; that, as plaintiff is informed and believes, said deed was wholly fictitious; that said mortgage was executed for the purpose of covering up and concealing a valuable piece of real estate as above described, and that said alleged assignee, Max Kahn, participated in said fraud with the said Isaac Greenhood; that the said Ignatz Weil knew nothing of said

mortgage having been executed until after the said assignment had been made, and did not attempt the same, and had nothing to do therewith, and, as plaintiff is informed and believes, had no claim against the said Isaac Greenhood for the said sum of $2,500, or any other sum. (6½) That said Isaac Greenhood, on the date of the assignment, to wit, on the 12th day of February, 1892, executed to one H. Barnett a deed of two-thirds of an acre of land situated in Lewis and Clarke county, and fully described in said deed, for the alleged consideration of $750, and duly acknowledged and put the same on record on said 12th day of February, 1892, at the hour of 8:55 p. m.; that said H. Barnett knew nothing of the execution of said deed until after the said assignment had been executed; that said deed was without consideration; that the same was never delivered to the said Barnett, and the execution of the same was for the purpose of covering up the land thereby conveyed, which was of the value of $750, and hindering and delaying the plaintiff and other creditors in the collection of their just debts; that said deed, and likewise the mortgage to I. Weil as hereinbefore set forth, was not delivered or put on record until after the execution, delivery and acceptance, on the part of the alleged assignee, of said deed of assignment; and that said Max Kahn, assignee, participated in said fraudulent devises.

"(7) That in said alleged assignment W. C. Hickey is made a preferred creditor for the sum of $4,500, and the same is not an indebtedness of the copartnership, but, if an indebtedness at all, is the individual indebtedness of the defendant Isaac Greenhood.

"X. That plaintiff is informed and believes, and so alleges, that said Bach, Cory & Co. are made preferred creditors in said pretended assignment for an amount largely in excess of the amount that was actually owing from said Greenhood, Bohm & Co. to said Bach, Cory & Co.

"XI. That said defendants Greenhood and Bohm placed one E. Rejall in the preferred class of creditors for the sum of $45,000, when at the time of the said assignment they were indebted to him only in the sum of $42,035.83.

"XI½. That on the —— day of ——, 1890, one I. Weil became and was a copartner of the defendants Greenhood and Bohm, in their business then being carried on in Helena, Montana, under the firm name of Greenhood, Bohm & Co., and in the city of New York under the firm name of Greenhood & Bohm; that said I. Weil from the date of said copartnership traveled as a salesman for the said Greenhood, Bohm & Co., until the 8th day of July, 1891, when he ceased to travel as such salesman for said house, and went to Sand Point, Idaho, where he purchased a stock of goods from one E. L. Weeks & Co. for the sum of about $6,000, paying in cash therefor the sum of about $4,000, and assuming for the remainder a balance of indebtedness owed by said Weeks & Co. to the firm of Greenhood, Bohm & Co. of Helena; that the cash payment of about $4,000 made upon said stock of goods was raised through the firm of Greenhood, Bohm & Co.; that said Weil had but little, if any, capital of his own; that he did a large business from the date of the opening of his said house in Sand Point, Idaho, on the 1st day of August, 1891, to the date of the assignment on the 12th day of February, 1892, the same being about $15,000 per month, aggregating the sum of $90,000; that, as plaintiff is informed and believes, the said defendants Greenhood and Bohm were jointly interested in said mercantile establishment at Sand Point, Idaho; and that they sold and disposed of, through said I. Weil at Sand Point, and through said mercantile establishment, a large amount of goods, realizing thereon large profits in moneys, which, together with said goods on hand, they failed to turn over to the said assignee, and that all the property, except the book accounts and bills receivable of the said defendant copartnership situated in Helena, and taken possession of by the defendant Max Kahn, had been seized under an attachment by the sheriff of Lewis and Clarke county, Montana, as aforesaid, and the same is now in his hands; that large expense is being incurred for keepers and otherwise, and that to sell said property at forced sale under an execution would result in a sacrifice of the same; that there are large quantities of clothing and other goods, which are lia-

ble to get out of style and otherwise deteriorate in value by being held; that the said Max Kahn has in his possession book accounts, and is collecting the same, and will continue to do so, and will pay out the same under said fraudulent assignment, and proceed to carry out and execute said pretended, fraudulent and fictitious trust and assignment, unless restrained by the court; that it is necessary for the interest of all parties that a receiver be appointed to take charge of all the property of said copartnership, and to sell the goods, wares and merchandise, and collect up the accounts, and pay them out under the orders of this court, as it shall finally determine the rights of the parties hereto to be.

"Wherefore the plaintiff demands judgment: (1) That the said assignment and claims of said assignee are fraudulent and void, as against the plaintiff; (2) that Max Kahn account, under the directions of the court, for all the property received by him as aforesaid; (3) that the defendants be restrained by injunction from interfering with the said property or its proceeds, except under the directions of the court; (4) that said defendant Max Kahn be restrained by injunction from carrying out or proceeding further with the execution of said fraudulent, fictitious and pretended assignment and trust; (5) that the plaintiff's judgment be satisfied out of the same; (6) that a receiver be appointed to take charge of said property, sell the same, and collect the outstanding accounts, to the end that the same may be applied to the satisfaction of the plaintiff's judgment; (7) and for costs of suit, and such other and further relief as to the court shall seem just and proper."

To the complaint was attached as an exhibit a copy of the deed of assignment made by Greenhood, Bohm & Co. to the defendant Max Kahn. The deed of assignment named as first preferred creditors the following persons, with the amounts set opposite their names: "Mrs. Catherine Westheimer, New York, $2,500; E. Rejall, New York, $45,000; the Merchants' National Bank, Helena, $38,000; the First National Bank, Helena, $17,000; Thomas Cruse Savings Bank, Helena, $7,500; American National Bank, Helena, $4,000; Consoli-

dated Milwaukee Beer Agency, $750; Mrs. J. M. Ryan, Helena, $2,000; J. Daniothy, $1,500; W. C. Hickey, $4,500; John Shober, $1,000; A. W. Sederberg, $1,000; L. Daniothy, $520; A. M. Dorsey & Co., $863; H. Barnett, $1,987; Bach, Cory & Co., $1,900; Cullen, Sanders & Shelton, $1,000; E. Pode, $1,000; Col. Morse, New Chicago, $3,500; Henry Hunter, Helena, $610.''

It was provided in the deed of assignment that, if the assets were sufficient, the assignee should pay these claims in full, but if not sufficient he should pay said claims ratably. It is sufficient to say of the remaining pleadings in the case that substantial issues were made upon practically all of the material matters set up in the complaint. A long, laborious, hotly-contested trial ensued, occupying, we understand, 21 days before the court and a jury. Both of the learned judges of the district court of the First judicial district sat in the trial of the case. We are informed by the opinion of the court below that the jury was one of unusual intelligence. That jury made the following findings of fact:

''(2) What money or property, if any, did Ferdinand Bohm withhold from the assignee of Greenhood, Bohm & Co., with the intent to hinder, delay, and defraud the creditors of said firm? Answer. He withheld money, but we are unable to state the amount.''

''(3) Did the defendant Isaac Greenhood retain any property from the assignee at the time that the assignment was made, with the intent to hinder, delay, and defraud the creditors of said firm of Greenhood, Bohm & Co.? Answer. Yes.''

''(4) Did Isaac Greenhood and Ferdinand Bohm have any understanding with any of their creditors that they should be preferred for a larger amount than was actually due them, and the money received by such creditor or creditors should be returned to them? Answer. No.''

''(5) Did the assignors have any understanding with Max Kahn, the assignee, that any of the property turned over to him as assignee, or any of the property of Greenhood, Bohm & Co., should be returned to them? Answer. No.''

"(6) Did said assignors, or either of them, have any agreement or understanding with the said assignee that he should administer the trust in their favor, or so that they would receive any profits or advantage thereby? Answer. No."

"(7) Were any of the creditors, named in the assignment as preferred for certain particular amounts, preferred for a larger amount than was due them, with a fraudulent and dishonest intent on the part of the assignors that the amount so named in excess of what was actually due to such creditor or creditors should be turned back to the assignors, or either of them? Answer. No."

"(7½) Is the amount mentioned in the assignment as due to Rejall the correct sum which was due him on February 12, 1892? Answer. No."

"(7¾) If you answer the foregoing questions in the negative, was the error made in good faith, or was it purposely done, and with the intent on the part of the assignors to hinder, delay, and defraud their just creditors, or with an understanding that the excess, if any, should be turned over to the assignors, or either of them? Answer. In good faith."

"(8) Did the assignors, or either of them, fraudulently conceal from the assignee any of the property of the firm of Greenhood, Bohm & Co., with the intent to defraud their creditors? Answer. Yes."

"(9) Was the execution of the mortgage on his homestead by Isaac Greenhood to Ignatz Weil so made with intent on the part of said Greenhood to fraudulently conceal or cover up any of his assets? Answer. Yes."

"(10) Was the deed made by the said Isaac Greenhood to the property in Richmond Hill addition to H. Barnett made with the intent to hinder, delay, or defraud any of the creditors of the said firm of Greenhood, Bohm & Co.? Answer. Yes."

"(11) Did the defendant Max Kahn, as assignee, take the New York property into his possession after the assignment, or make any attempt to do so? Answer. No."

"(12) Could he reasonably, through an agent, have taken

possession of the said property so situated in the city of New York, before the attachment of the same on the 15th of February, 1892 ?    Answer.    Yes.''

"(13) Is the alleged indebtedness of Col. Morse of $3,500, as set out in the deed of assignment, the indebtedness of the firm of Greenhood, Bohm & Co., or the personal indebtedness of Isaac Greenhood ?    Answer.    Firm indebtedness.''

"(14) What was the value of the goods situated in Helena, together with the book accounts and bills receivable, at the date of the assignment on the 12th day of February, 1892 ?    Answer.    About $75,000.''

"(15) What was the total indebtedness of Greenhood, Bohm & Co., of Helena, and Greenhood and Bohm, of New York, on the 1st day of February, 1890 ?    Answer.    About $210,-000.''

"(16) What was the total indebtedness of Greenhood, Bohm & Co. and Greenhood and Bohm on the 1st day of February, 1891 ?    Answer.    About $240,000.''

"(17) What was the total indebtedness of Greenhood, Bohm & Co. and Greenhood and Bohm on the 1st day of February, 1892 ?    Answer.    About $250,000.''.

"(18) How much were the defendants Greenhood, Bohm & Co. owing Caroline Westheimer at the date of the assignment ?    Answer.    About $2,436.93.''

"(19) Was said Isaac Greenhood, at the date of the execution of the mortgage to Weil, individually indebted to said Weil ?    Answer.    No.''

"(20) Did said I. Weil know of the execution of said mortgage at the time it was executed, or before the execution of the deed of assignment, on the 12th day of February, 1892 ?    Answer.    No.''

"(21) Did said I. Weil know of the execution of said mortgage and note, or have anything to do therewith until after the execution and delivery of said deed of assignment ?    Answer.    No.''

"(22) What was the value of said real estate at the date of the execution of said deed of assignment, to wit, on the 12th

of February, 1892, exclusive of improvements? Answer. About $5,000."

"(23) What was the value of the house and improvements upon said real estate? Answer. About $4,000."

"(24) Did H. Barnett know anything of the execution of the deed to him until after the assignment had been executed, accepted and recorded? Answer. No."

"(25) Was said deed ever delivered to H. Barnett? Answer. No."

"(26) Was there any indebtedness on the part of Greenhood, Bohm & Co. to the said Barnett at the date of the execution of the said deed on the 12th day of February, 1892? Answer. Yes."

"(27) What was the amount of the indebtedness to Bach, Cory & Co. from the defendants at the time of the assignment, to wit, on the 12th day of February, 1892? Answer. About $1,385."

"(27½) Was the failure to deduct the amount of Bach, Cory & Co.'s indebtedness from the amount due Bach, Cory & Co. by Greenhood, Bohm & Co. done by the assignors with the intent to delay, hinder and defraud their creditors, or was it done in good faith? Answer. In good faith."

"(28) What was the actual indebtedness of the firm of Greenhood, Bohm & Co. to E. Rejall at the date of the assignment, to wit, on the 12th day of February, 1892? Answer. About $42,035.83."

"(29) Was I. Weil a copartner in the firm of Greenhood, Bohm & Co. during the year 1890? Answer. Yes."

"(30) If you answer the foregoing question in the affirmative, state whether such copartnership was ever dissolved. Answer. Yes."

"(31) Did said I. Weil go into the mercantile business at Sand Point, Idaho, on the 1st of August, 1891? Answer. Yes."

"(32) If you answer the foregoing in the affirmative, state whether he bought out the firm of E. L. Weeks & Co. and raised the money by which to buy out said firm upon the credit of Greenhood, Bohm & Co. Answer. Yes."

"(33) If you answer the foregoing in the affirmative, state how much he raised.    Answer.    $3,750."

"(34) What was the volume of business done by I. Weil at Sand Point, Idaho, from the 1st day of August, 1891, to the 12th day of February, 1892?    Answer.    About $90,000."

"(35) Did Isaac Greenhood raise the inventory of merchandise on the 1st of March, 1891, and, if so, how much?    Answer.    Yes; about twenty per cent. above original cost where purchased."

"(36) If you answer the foregoing in the affirmative, state with what intent the inventory was so raised.    Answer.    To cover cost of freight and expenses."

"(37) Did Isaac Greenhood raise the inventory on the 1st of March, 1890, and, if so, how much did he raise the same?    Answer.    About twenty per cent. above original cost where purchased."

"(38) If you answer the foregoing interrogatory in the affirmative, state with what intent he so raised the inventory.    Answer.    To cover cost of freight and expenses."

"(39) Did Isaac Greenhood raise the inventory of merchandise on the 1st of March, 1889, and, if so, how much did he raise the same?    Answer.    Yes; about twenty per cent. above the original cost where purchased."

"(40) If you answer the foregoing interrogatory in the affirmative, state with what intent he raised the same.    Answer.    To cover cost of freight and expenses."

"(41) If you answer the interrogatory in relation to the raising of the inventory of merchandise of the 1st of March, 1891, state whether the defendant Ferdinand Bohm knew it had been so raised shortly after the same had been done.    Answer.    Yes."

"(42) Was a credit given to each of the defendants, Isaac Greenhood and Ferdinand Bohm, on the merchandise account of the sum of $5,000, on the 30th of June, 1891?    Answer.    Yes."

"(43) If you answer the foregoing in the affirmative, state

with what intent this was done.    Answer.    To make a better showing in the capital stock of the partners.''

" (44) What was the amount of the inventory of merchandise of Greenhood, Bohm & Co. on the 1st of February, 1892 ?  Answer.    $57,564.30.''

" (45) What was the average gross profits on the sales of merchandise of the firm of Greenhood, Bohm & Co. from the 1st of March, 1891, to the 1st of February, 1892 ?   Answer. The average profit was about twenty-five per cent.''

" (46) What was the amount of merchandise on hand on the 1st of March, 1891, at Helena ?   Answer.    About $139,-929.56.''

" (47) What was the amount of purchases from the 1st of March, 1891, to the 1st of February, 1892 ?   Answer.    $257,-204.62, including freight on the same.    Freights, $15,-044.37.''

" (48) What was the amount of sales from the 1st of March, 1891, to the 1st of February, 1892 ?   Answer.    $342,-173.82.''

" (49) What amount of merchandise should have been on hand on the 1st of February, 1892 ?   Answer.    They should have had about $120,000 on hand in merchandise.''

" (50) Did the defendants Greenhood and Bohm borrow from E. Rejall the sum of $59,400, from the —— day of June to the —— day of December, 1891 ?   Answer.    Yes.''

" (51) Did the said Greenhood and Bohm reduce the indebtedness of the firm of Greenhood, Bohm & Co. and Greenhood & Bohm, during the years 1890 and 1891, or did they increase their indebtedness? and state how much said debts were increased or decreased.    Answer.    They increased their indebtedness about $40,000 during the years 1890 and 1891.''

" (52) Did the defendants Greenhood and Bohm, both or either of them, make the deed of assignment on the 12th of February, 1892, with the intent to hinder, delay or defraud their creditors, or any of them, out of their just debts?   Answer.    Yes.''

" (53) If you answer the foregoing in the affirmative, state

whether the defendant Max Kahn participated in such fraudulent intent.    Answer.    Yes."

"(54) Did Greenhood, Bohm & Co. own forty shares of stock in the Consolidated Milwaukee Beer Company at the date of the assignment, and, if so, what was its value?    Answer.    Yes.    Value, $1,350."

"(55) If you answer the foregoing interrogatory in the affirmative, state whether they had transferred the same to Max Kahn as collateral or pledge for indebtedness owed by the firm of Greenhood, Bohm & Co. to the said Consolidated Milwaukee Beer Company before the date of the assignment.    Answer.    Yes."

"(56) Has said stock been sold since the assignment, and the debt of the said Consolidated Milwaukee Beer Company been paid out of the proceeds thereof?    Answer.    Yes."

"(57) Did Greenhood and Bohm, both or either of them, appropriate any portion of the assets of the firm of Greenhood, Bohm & Co., either in money or goods, wares and merchandise, at or before the execution of said assignment, and did they have the same, or any portion thereof, in their possession or under their control at the time of the assignment, and fail or refuse to turn the same over to the assignee?    Answer.    Yes; both of them."

"(58) If you answer the foregoing question in the affirmative, state whether they so failed or refused to turn the same over to the assignee for the purpose of hindering, delaying or defrauding their creditors.    Answer.    Yes."

"(59) Was the consideration for which the original note, of which the present note held by W. C. Hickey was a renewal, received by Isaac Greenhood individually, and used for his individual benefit, or was it received by the firm of Greenhood, Bohm & Co., and used by said firm?    Answer.    It is a firm obligation."

"(60) Was the Hickey transaction done with fraudulent intent?    Answer.    No."

The court adopted all of these findings.    The court thereupon of its own motion also made the following findings :

" (1) That the Merchants' National Bank, of Helena, Montana, is, and was at all times mentioned in the amended complaint filed in this action, a banking corporation, organized and existing by virtue of the banking laws of the United States, and doing business in the city of Helena, Montana, and elsewhere.

" (2) That the said Isaac Greenhood and Ferdinand Bohm are now, and were at all the times mentioned in the amended complaint filed in this action, copartners doing business in the city of Helena, and elsewhere, under the firm name and style of Greenhood, Bohm & Co.

"(3) That on the 13th day of February, 1892, an action was duly commenced by the plaintiff, the Merchants' National Bank, of Helena, Montana, against the defendants Isaac Greenhood and Ferdinand Bohm, copartners doing business under the firm name and style of Greenhood, Bohm & Co., in the district court of the First judicial district of the state of Montana, in and for the county of Lewis and Clarke, in department No. 1 of said court, by the filing of a complaint and the issuance of a summons, for the recovery of a judgment for the sum of $20,000, together with interest thereon at the rate of ten per cent. per annum from the 27th day of November, 1891, and for the sum of $13,500, with interest thereon at the rate of ten per cent. per annum from the 19th day of November, 1891, and for the sum of $1,000, with interest thereon at the rate of ten per cent. per annum from the 16th day of January, 1892, upon certain demand notes made, executed, and delivered by the copartnership of Greenhood, Bohm & Co. to said plaintiff.

"(4) That on said date a writ of attachment was duly issued in due form, in said last-named action, after the issuance of the summons herein, and placed in the hands of the sheriff of Lewis and Clarke county, Montana, for execution.

"(5) That on February 15, 1892, the said sheriff, by virtue of the power and authority vested in him as such officer, and under and by virtue of said writ of attachment, did levy upon and seize and take into his possession that certain stock of

goods, wares, and merchandise, situate and being in that certain store building on South Main street, in the city of Helena, known and designated as No. 24, and on said date attached by garnishment all the money and other property and effects of said defendants Greenhood, Bohm & Co., in the hands of Max Kahn, assignee.

"(6) That thereafter, on the 8th of April, 1892, judgment was duly rendered and entered in said last-named action in said district court, in favor of the plaintiff in said action, and against said Isaac Greenhood and Ferdinand Bohm, copartners as aforesaid, for the sum of $35,945.48, with interest thereon at the rate of 10 per cent. per annum from the date of said judgment.

"(7) That thereafter, to wit, on the 18th day of April, 1892, an execution was duly issued on said judgment against the property of said defendants Isaac Greenhood and Ferdinand Bohm, copartners as aforesaid, addressed and directed to the said sheriff of Lewis and Clarke county, state of Montana, in which said county said defendants reside, and was by said sheriff returned with the following indorsement thereon, to wit: 'No property to be found in my county to satisfy the foregoing execution, except the property attached herein, and embraced in an alleged assignment from Greenhood, Bohm & Co. to Max Kahn, on the 12th day of February, 1892, and except the above garnishments; and I herewith return the said execution unsatisfied.' And the court further finds from the said return that, so far as garnishees answered, there was only $4.42 levied upon by virtue of said execution.

"(8) That the defendants Isaac Greenhood and Ferdinand Bohm, or either of them, have not, and did not have at the time of the issuance and return of said execution, any property in this state, known to the plaintiff, out of which said execution so issued as aforesaid could be satisfied in whole or in part, except that claimed by the said Max Kahn as assignee, under and by virtue of the assignment sought to be set aside in this action.

"(9) That the said defendant in this action, Max Kahn, is a

man without means, and pecuniarily and wholly irresponsible, and has not given any bond for the faithful performance of his duties as assignee.

"(11) That the said deed of assignment was executed and delivered by the assignors to Max Kahn, the assignee, and accepted by him about 7 o'clock p. m. on the 12th day of February, 1892."

The deed of assignment was recorded by the county clerk and recorder, and the court also found that the same was duly acknowledged by the parties executing the same.    The court found, as conclusions of law, as follows:

"(1) That the said assignment was made, executed, and delivered with the intent on the part of the said assignors, Isaac Greenhood and Ferdinand Bohm, with intent to hinder, delay, and defraud the plaintiff herein, and other creditors of the said defendants Isaac Greenhood and Ferdinand Bohm, and of the firm of Greenhood, Bohm & Co., and is fraudulent and void as to plaintiff and the other creditors not assenting thereto.

"(2) That the plaintiff, by its writ of attachment and judgment in the said action so commenced on the 13th day of February, 1892, and the levy so made under said writ of attachment, has a lien upon all property seized and levied upon by the said sheriff, under and by virtue of the said writ of attachment, and the proceeds thereof in the possession and under the control of the receiver appointed in this action, or so much thereof as may be necessary to satisfy the plaintiff's judgment, interest, and costs, which lien took effect on the 15th day of February, 1892, at the time of the said seizure and levy, and under and by virtue of the said writ of attachment.

"(3) That the plaintiff, by virtue of the said judgment and execution and the commencement of this action, has a lien upon all the property of every description, and the proceeds thereof, in the possession and under the control of the receiver appointed in this action, or so much thereof as may be necessary to satisfy plaintiff's judgment, interest, and costs, which lien

took effect upon the 21st day of April, 1892, when the complaint herein was filed and the summons herein was issued. Judgment and decree ordered accordingly.''

The judgment was in accordance with the findings, and need not be recited.   A motion for new trial was made by defendants and denied by the court, from which motion, and also from the judgment, the defendants appeal.  The grounds for a motion for a new trial, and the alleged errors relied upon by the appellants, are stated as they are discussed in the opinion below.

*Cullen & Toole, T. C. Bach, Walsh & Newman, J. T. Walsh, Shober & Rasch, H. N. Blake, and Geo. F. Shelton,* for Appellants.

1.   The plaintiff fails to set forth in its amended complaint any ground for the equitable interference of the court.  While there is some  conflict  in  the  authorities  as to the right of a creditor  to seize the  property  in  the hands of the assignee, still, in this case, the plaintiff elected to so proceed and caused the sheriff to take  it into his possession under the writ of attachment   to   hold   subject   to   sale   under   execution upon any  judgment the plaintiff might  recover.  The plaintiff certainly cannot now be heard to  say that its proceedings under said writ were without authority of law.   Where the assigned property has been thus seized by a creditor the assignee may bring an action of trespass, and  this  will raise the question as to  the validity of the assignment.  (*Massey* v. *Noyes,* 26 Vt. 462; *Hutchinson* v. *Lord,* 1 Wis. 286; Burrill on Assignments, § 452.)   The plaintiff  having  elected  to  treat the assignment as an absolute nullity, must stand or fall by  the consequences of those acts.  The sheriff having seized the property under this writ and taken the same into his possession did so ''as security for the satisfaction of any judgment that might be  recovered  in  said  action.''   (Code  of  Civil  Procedure, § 181.)   Section 191.—''The  sheriff  shall  make a full return of the property attached and return the  same with the  writ.'' Section 192.—* * *  ''Property  attached  by him shall  be

retained by him to answer any judgment that may be recovered in the action." Section 194.—"If judgment be recovered by plaintiff the sheriff shall satisfy the same out of the property attached by him." "An attachment lien upon property can be enforced only by a sale of the attached property under execution." (*Meyers* v. *Mott*, 29 Cal. 860.) This is a suit in equity, in the nature of a creditor's bill, and the equitable jurisdiction depends for its existence upon the absence of a plain, speedy and adequate remedy at law. In order to maintain a creditor's bill, the creditor must first have exhausted his remedy at law. If he seeks the aid of a court of chancery against the real estate of his debtor, he must show a judgment at law, creating a lien on such estate. If he seeks aid in regard to the personal estate, he must show an execution which he has pursued to every available extent at law, before he can resort to equity for relief. (*Binkerhoff* v. *Brown*, 4 Johns. Ch. 671; *Jones* v. *Green*, 1 Wallace 330; *Beck* v. *Burdette*, 1 Paige 308.) The obstruction, fraudulent or inequitable, appears from the authorities to be some obstruction by which the property is placed beyond the reach of the execution, and is in such a position that the plaintiff cannot avail himself of it without the aid of a court of equity. (*Cassidy* v. *Meacham*, 3 Paige 311, 3 Pomeroy's Equity Jurisprudence, § 1415; Freeman on Executions, §§ 427, 428; *Bassett* v. *Orr*, 7 Biss. 296; *In re Remington*, 7 Wis. 643; *Buckeye Engine Co.* v. *Donau Brewing Co.*, 47 Fed. Rep. 6; *Gerry* v. *Gerry*, 63 N. Y. 252; *Schubert* v. *Howell*, 39 N. E. 913 (Illinois); *Pond* v. *Howard*, 34 N. E. 768; *Kittle* v. *August T. & G. R. Co.*, 65 Fed. 859.) Court could not appoint receiver in aid of an attachment. (*State ex rel N. Y. Sheep Co.* v. *District Court*, 14 Mont. 577.) A bill to remove a fraudulent obstruction must show that the execution is outstanding and "its return would be fatal to the relief sought." (*McElwain* v. *Willis*, 9 Wend. 548, 561; *Brock* v. *Rich*, 43 N. W. 580.) The rule is well settled that the creditor's bill filed for the purpose of removing a fraudulent obstruction must show that such removal will enable a judgment creditor to attach the property. (*Spring* v.

*Short,* 90 N. Y. 545; *Thurber* v. *Blank,* 50 N. Y. 80; *Lynch* v. *Crary,* 52 N. Y. 184.)   Where the subject matter or primary right, or interest, although legal, is one of a class which may come within the concurrent jurisdiction of equity, and an action at law has been already commenced, a court of equity will not, unless some definite and sufficient ground of equitable interference exists, entertain a suit over the same subject matter, even for the purpose of granting relief peculiar to itself, such as cancellation, injunction, etc., and much less grant the same kind of relief which can be obtained by a judgment at law.   The ground which will ordinarily prevent the application of this doctrine, and will permit the exercise of the equitable jurisdiction in such cases, is the existence of some distinctive equitable feature of the controversy, which cannot be determined by a court of law.   This rule results, in part, in the United States, from the provisions of the national and state constitutions, securing the right to a jury trial, which belongs especially to the machinery of legal actions. (1 Pomeroy Eq. Juris. § 179; *Bank of Bell Falls* v. *Rutland, etc. R. R. Co.,* 28 Vt. 470; *Crane* v. *Bunnell,* 10 Paige 333; *Hipp* v. *Babin,* 19 How. 271; *Ins. Co.* v. *Bell,* 13 Wall. 616; *Oelrichs* v. *Spain,* 15 Wall. 211 to 228; *Grand Chute* v. *Winegar,* 15 Wall. 373; *Smith* v. *McIver* 9 Wheat. 532.)

II.   The conveyances of Greenhood to Barnett and Weil were not a fraud upon any of the creditors of Greenhood, Bohm & Co.   That a debtor may prefer and secure his creditors is too well settled to require citation of authorities.   The conveyances were executed to secure valid and existing debts against the firm.   The property conveyed was owned individually by Greenhood, and he could thus use it to secure the creditors of the firm or his individual creditors.   (*Curtis* v. *Valiton,* 3 Mont. 153; *Crawford* v. *Neil,* 144 U. S. 585; *Smith* v. *Perine,* 24 N. E. 804; *Armstrong* v. *Hurst,* 18 S. E. 150; *Trumbo* v. *Hammel,* 8 S. E. 83; *Auley* v. *Ostermann,* 25 N. W. 657; *Schoveley* v. *Kovar,* 18 N. W. 134; *Fairbanks* v. *Haynes,* 23 Pick. 326; *Sampson* v. *Arnold,* 19 Iowa 480; *Sweitzer* v. *Higby,* 63 Mich. 13.)   It is conceded they each

retained small sums of cash, enough only for present necessities, but that is not fraudulent. (Cases cited below and *Shotwell* v. *Nicollet Bank*, 45 N. W. 842. See *Wortlun* v. *Griffith*, 28 S. W. 286; *Parsell* v. *Patterson*, 47 Mich. 505; *Wilson* v. *Forsyth*, 24 Barb. 105; *Ecks* v. *Copeland*, 53 Tex. 501; Burrill on Assignments, 6th Ed. § 252.) Unintentional error in stating amount due creditor does not vitiate the assignment. (*Barrochlet* v. *Fisch*, 63 Cal. 462; *Smith* v. *Bowey*, 51 Wis. 258; *Pinneo* v. *Hart*, 30 Mo. 561, 77 Am. Dec. 625; *Jones* v. *McQueen*, 14 So. 146; *Roberts* v. *Buckley*, 39 N. E. 966.) This last case, is the same as *Roberts* v. *Vietor*, 130 N. Y. 598, cited by respondents; on the second appeal the court overruled the decision in the 130th N. Y. and commented upon and approved *Peyser* v. *Meyers*, 32 N. E. 699. And by way of analogy, we cite: *Bank* v. *Seligman*, 34 N. E. 196; *Spellman* v. *Freedman*, 29 N. E. 765.; *Aligg* v. *Bishop*, 36 N. E. 1058; *Maass* v. *Falk*, 40 N. E. 504..

III. Even though it were proven that the assignors fraudulently secreted and failed to turn over assets, that fact does not invalidate the assignment. (*Emerson* v. *Senter*, 118 U. S. 3; *Estes* v. *Gunter*, 122 U. S. 450; *Vernon* v. *Davis*, 2 S. E. 114; *Reinhard* v. *Bank*, 6 B. Mon. 252; *Wilson* v. *Berg*, 88 Pa. St. 167.) A partial assignment is valid when not prohibited by statute. (*Buck* v. *Chase*, 52 N. W. 196; *Loomis* v. *Stewart*, 75 Ia. 387.) In a conveyance made directly to a creditor, in satisfaction of, or as security for his debt, the law is so indulgent that though he know the assignor is doing it to defraud his other creditors, yet if the grantee takes it honestly to secure or pay his claim, and not to aid the debtor in his fraudulent purpose, the transfer is good. A marked distinction exists between such cases and those in which a party becomes a voluntary purchaser, even though he pay cash. (*Aultman* v. *Heiney*, 13 N. W. 856; *Chase* v. *Walters*. 28 Iowa 460.) And why should the rule be different here? This conveyance, in substance,. is to the creditors and not to Kahn. So say the authorities. (Bump on Fraudulent Conveyances, 360.)

IV. There is no allegation, nor is there any testimony that any of the creditors participated in, or had any knowledge of any fraud; or that there was any understanding or agreement between any of them and the assignors or assignee, that the assignors should receive any benefit from the assignment. They cannot be deprived of their rights thus acquired when they did not participate in, or have knowledge of any fraud. Their rights cannot be affected by any antecedent or subsequent acts of the grantors; nor can they be affected by any intent on the part of the grantors of which they, the beneficiaries, had no knowledge, and in which they did not participate. (*Cornish* v. *Dews*, 18 Ark. 172; *Emerson* v. *Senter*, 118 U. S. 3; *Estes* v. *Gunter*, 122 U. S. 450; *Peters* v. *Bain*, 133 U. S. 670; *Pettit* v. *Parsons*, 33 Pac. 1038; *Ruffner* v. *Welton Coal & Salt Co.*, 15 S. E. 48; *Mean* v. *Montgomery*, 23 Fed. 421; *Ball* v. *Rooks*, 50 Fed. 898; *Hempstead* v. *Johnson*, 18 Ark. 123; *Marbury* v. *Brooks*, 7 Wheat. 556; *Brooks* v. *Marbury*, 11 Wheat. 78 and 88; *Thompson* v. *Wheeler*, 16 Peters 106; *Shelly* v. *Booth*, 73 Mo. 74; *Kinney* v. *Dow*, 13 Am. Dec. 342; *Pruit* v. *Wilson*, 103 U. S. 361; *Cohn* v. *Ward*, 9 S. E. 41; *Klee* v. *Reitzonberger*, 23 W. Va. 749; *Bank* v. *Arthur*, 3 Grat. 173; *Truss* v. *Davidson*, 7 So. 812; *Shearer* v. *Loften*, 26 Ala. 703; *Jewell* v. *Knight*, 123 U. S. 426; *Stover* v. *Herrington*, 7 Ala. 142; *Abercrombie* v. *Bradford*, 16 Ala. 704; *Governor* v. *Campbell*, 17 Ala. 566; *Insurance Co.* v. *Pittiway*, 24 Ala. 544; *Miles* v. *Hayne*, 3 Head, 332; *Hill* v. *Woodbury*, 49 Fed. 138; *Porter* v. *James*, 67 Fed. 21; *Morris* v. *Lindauer*, 54 Fed. 23.) Poverty of assignee is no ground for avoiding an assignment. (*Argell* v. *Rosenburg*, 12 Mich. 241; *Pearce* v. *Beach*, 12 How. Pr. 404; *Clark* v. *Groon*, 24 Ill. 316; *Taylor* v. *Watkins*, 13 So. 811.)

V. The plaintiff was permitted by the court to prove statement by the assignors concerning their intentions in making the assignment, which statements were made some days after it was executed, and after possession had been delivered under it, and after the goods had passed into the possession of the

sheriff under the attachment.      This evidence was inadmissible.
(§§ 620, 621, Code of Civil Procedure; *Silva* v. *Serpa,* 86
Cal. 1013; *Walden* v. *Purvis,* 73 Cal. 518; *Hutchings* v.
*Hutchings,* 48 Cal. 152; *Jacobs* v. *Remsen,* 36 N. Y. 668;
*Sprague* v. *Kneeland,* 12 Wend. 161; *Coyne* v. *Weaver,* 84 N.
Y. 386; *Chase* v. *Horton,* 143 Mass. 118; *Roberts* v. *Med-
bury,* 132 Mass. 100; *Bogert* v. *Phelps,* 14 Wis. 95; *Adler* v.
*Apt,* 30 Minn. 45; *Bates* v. *Ableman,* 13 Wis. 644; *Ohio,
etc.,* v. *Davenport,* 47 Ohio St. 194; *Schebel v. Jordan,* 30
Kan. 353; *Bixby* v. *Carskaddon,* 63 Ia. 174, S. C., 70 Ia.
726; 1 Phillips on Evidence, 318-322.      See *Truax* v. *Slater,*
86 N. Y. 632; *Kane* v. *Larkin,* 30 N. E. 105; 131 N. Y.
300; *Cayler* v. *McCartney,* 40 N. Y. 224.)

VI.  If the assignment could be set aside by the court, the
only decree it could make in this proceeding would be a decree
to marshal the assets and to require all the creditors to come
in and prove up their claims, to the end that they might share
*pro rata* in the funds.      The plaintiff has no lien prior to any
of the other creditors.      It abandoned its lien under the attach-
ment and execution, if it ever had a lien, when it ordered the
execution to be returned unsatisfied, while the property was
in the hands of the sheriff.      When an execution is returned or
becomes dormant the lien created by it is extinguished.
(Wait on Fraudulent Conveyances, § 87 on page 137; *Buswell*
v. *Lincks,* 8 Daily 527; *Watrous* v. *Lathrop,* 4 Sanford, N.
Y 700; *Richards* v. *Cunningham,* 6 N. W. 475; Freeman on
Executions, 207; *Buckeye Engine Co.* v. *Donau Brewing Co.*
47 Fed. 6.)

*B. Platt Carpenter* and *McConnell, Clayberg & Gunn,* for
Respondent.

I.  It is argued that it does not appear that the execution issued
on the judgment previously obtained by the plaintiff against
the defendants, Isaac Greenhood and Ferdinand Bohm, was re-
turned *nulla bona,* and that such a return is necessary to sus-
tain an action of this character.      There are two classes of
creditors' action :      One where the enforcement of the legal

remedy is obstructed by some incumbrance upon the debtor's property, or some fraudulent transfer of it, and the action is brought to remove such obstruction, and the other, for the discovery of assets and to reach equitable assets which are not subject to execution at law. (*Seibert* v. *Pittsburg*, 1 Wall. 272; *Beck* v. *Burdett*, 1 Paige Ch. 305; Pomeroy's Eq. Jurisprudence, § 1415; Freeman on Executions, § 424; *Tuck* v. *Olds*, 29 Fed. Rep. 738.) In order to maintain a creditor's action to reach property not open to execution at law, it must appear that the plaintiff has no adequate remedy at law. The usual method of establishing the fact of the inadequacy of the remedy at law is by obtaining a judgment and issuing an execution, which is returned *nulla bona.* This method, however, is not exclusive. Whenever the complaint shows that the debtor is insolvent, or has no property subject to execution, the action is sustained without the issuance and return of an execution. In such a case the issuance of an execution would be an idle ceremony. Where the creditor's action is brought to remove a fraudulent obstruction, the inadequacy of the remedy at law does not depend upon the want of legal assets, but upon the fact that there is a fraudulent incumbrance or other obstruction in the way of making the legal estate of the debtor available. In such a case the issuance of an execution is unnecessary, unless for the purpose of obtaining a lien upon the property of the debtor. (*Case* v. *Beauregard*, 101 U. S. 688.) In some of the cases it is held that an attachment lien will not support a creditor's bill before judgment is obtained. But the decisions are uniform that after judgment the lien acquired by the levy of an attachment is sufficient. (*Tappan* v. *Evans*, 11 N. H. 311–327; *Chicago Bridge Co.* v. *Packing Co.*, 46 Fed. 584; *Sheafe* v. *Sheafe*, 40 N. H. 518; *Conroy* v. *Words*, 13 Cal. 633; *Robert* v. *Hodges*, 16 N. J. Eq., 305; *Bob* v. *Woodward*, 50 Mo. 95; *Zell* v. *Soper*, 75 Mo. 406; Pomeroy's Equity Jurisprudence, § 1415, and note; *Naussauer* v. *Techner*, 65 Wis. 288; *Benham* v. *Ham*, 34 Am. St. R. 851; *Heymenan* v. *Donneberg*, 65 Am. Dec. 519; *Leopold* v. *Silverman*, 7 Mont. 266.) The New York cases cited by ap-

pellant to sustain their position that the issuance and return of an execution *nulla bona* is a condition precedent to the exercise of chancery jurisdiction in all creditor's actions,—are not in point as in that state the matter is regulated by statute.

II.    Plaintiff did not lose its lien, acquired by virtue of the attachment, by the return of the execution unsatisfied. (§ 204 Code of Civil Procedure, Compiled Statutes.)    "When an attachment is served, a lien on the property attached is created, which nothing subsequent can destroy but the dissolution of the attachment." (Drake on Attachment, § 224.)    Where property has been attached, the only function of an execution is to operate as an order of sale or power of attorney to sell the attached property.    (§§ 194, 319 Code of Civil Procedure, Compiled Statutes.)    Under the special return made by the sheriff, upon the execution, showing no levy of said writ upon said attached property, the issuance of the execution and this special return can not in any manner affect said property or the lien acquired by the levy of the attachment.    The omission to note in the return a levy of the execution upon this attached property shows plainly the intention of the sheriff not to interfere with the property or the lien acquired by the attachment.    There are cases holding that a plaintiff cannot seek the aid of a court of equity to remove a fraudulent transfer if the debtor has other property unincumbered sufficient to satisfy the judgment rendered against him. This is upon the theory that if the debtor has property open to execution sufficient to satisfy the judgment against him, any transfer he may have made does not operate as a fraud upon the creditor. (*Dunham* v. *Cox*, 10 N. J. Eq. 467; *Brinkerhoff* v. *Brown*, 4 John's Ch. 674.)    Under these authorities it was necessary, notwithstanding the lien acquired by the attachment, to endeavor to reach other property not embraced within the fraudulent transfer before going into equity. It was proper and necessary to ascertain that there was no property to be found except the particular property attached before commencing the present action.    Where property has been attached which is embraced within a fraudulent assign-

ment and which is insufficient to satisfy a judgment obtained in the action, the plaintiff may commence a creditor's action for the double purpose of removing the fraudulent transfer and discovering and reaching equitable assets which are not open to execution. (*Beam* v. *Bennett*, 51 Mich. 149; *Reeg* v. *Burnham*, 55 Mich. 39; *Cuyler* v. *Moreland*, 6 Pai. Ch. 271.) This action, therefore, is an action to remove a fraudulent conveyance and make the lien acquired by the attachment effectual, and also to reach property not subject to execution at law. It was not certain that the proceeds of the property attached would be sufficient to satisfy plaintiff's claim after payment of costs, and for that reason the action was commenced for the double purpose stated. In any event, it clearly appears that so far as the other creditors are concerned, if they had seen fit to come in under the invitation extended, it would be necessary to discover and reach property not subject to execution in order to satisfy their claims.

III. Appellants submit the proposition that an attachment lien upon property can be enforced only by a sale of the attached property under execution. "There is an inherent power in a court of law, as well as in a court of equity, to control its own process and in the disposition of property in custody of the law, so as to prevent serious injury to the parties interested in said property and to afford justice and adequate relief." This is the language used in the opinion in the case of *Naunberg* v. *Hyatt*, 24 Fed. 902. See also *Knippendorf* v. *Hyde*, 110 U. S. 276; *Raisen* v. *Stratham*, 22 Fed. 144; *McCann* v. *Superior Court*, 15 Pac. 448. The fact that the statute of this state provides for the sale by the sheriff of the property attached, etc., does not abrogate the right of the court to control its process as laid down in the decision just cited. "The statute is to be read in harmony with the existing principles of equity jurisprudence, if the intention to do way with the application of such principles is not manifest." (Beach's Equity Jurisprudence, § 931; *Lowell* v. *Doe*, 44 Minn. 144; same case, 46 N. W. 297.)

IV. The admission of what appellants term "subsequent

statements of assignors," is assigned as error.   It appears
from the allegations of the complaint and the findings of the
jury that Max Kahn participated in the fraudulent intent of
the assignors in making such assignment.   It also appears that
the assignors retained possession of both money and goods,
wares and merchandise,. aggregating thousands of dollars, with
the intent to hinder, delay and defraud the creditors.   It also
appears that possession of the property in New York was
never taken by the assignee, although he could have taken pos-
session.   In view of the allegations of the complaint, and the
findings just referred to, the evidence objected to was clearly
competent.   Declarations or admissions of assignors when in
possession of property assigned, are always admissible.   (*Murch*
v. *Stevenson*, 42 N. W. 290; *Newlan* v. *Lynn*, 49 N. Y. 661;
*United States* v. *Griswold*, 8 Fed. 556; *Hamburg* v. *Wood*, 18
S. W. R. 623; Rice on Evidence, page 950 · and cases cited;
Bump on Fraudulent Conveyances page 588; *Franklin* v.
*Coots*, 41 Mich. 75.)   Wherever there is a conspiracy to de-
fraud or a concert of action or intent on the part of the as-
signor and assignee, subsequent declarations of the assignor
are admissible.   (*Reihl* v. *Foundry Association*, 3 N. E. 633;
*Hunsinger* v. *Hoffer*, 11 N. E. 463; *Hamburg* v. *Wood*, 18 S.
W. 623; *Kromer* v. *Kaden Clothing Co.*, 17 Atl. R. 580;
Burrill on Assignments, § 362; *Apthorp* v. *Comstock*, 2 Pai.
Ch. 488; 1 Greenleaf on Evidence, § 111; Rice on Evi-
dence, page 960; *Kleinschmidt* v. *Dunphy*, 1 Mont.
118.)   But, admitting for the sake of argument, that this
evidence was wholly inadmissible, the admission of the
same was error without prejudice, because of the findings
of the jury that a large amount of assets was retained
and not delivered under the assignment; that there were illegal
preferences, and that there were other fraudulent transfers at
about the same time.   It is well settled that in an equity case
the admission of improper testimony, or the rejection of proper
testimony, is no ground for a 'new trial, if the court, upon
consideration of all the testimony, is satisfied that justice has
been done.   (*Anthorp* v. *Comstock*, 2 Paige 482; *Head* v.

*Head*, 1 Sim. and Stu. 150; same case on Appeal, 1 Turner & Russell 142; *Barker* v. *Bay*, 2 Russell 63 and note; *Forrest* v. *Forrest*, 25 N. Y. 510; *Muloch* v. *Muloch*, 1 Edwards Ch. 14; *Forrest* v. *Forrest*, 8 Bosworth 654; *Snell* v. *Loucks*, 12 Barb. 389; *Sawyer* v. *Campbell*, 22 N. E. 458; *King* v. *Whaley*, 59 Barb. 71; *Matter of R. R. Co.*, 90 N. Y. 347.

V.   In order to render an assignment for the benefit of creditors made under the laws of this state, void, it is not necessary that there should be a fraudulent intent both on the part of the assignor and the assignee.    (§§ 229, 232, Fifth Division, Compiled Statutes, quoted in the opinion of the court.)    In order to demonstrate to a mathematical certainty that the intent referred to in section 229 is the intent of the assignor it is only necessary to show that the assignee under an assignment for the benefit of creditors is not a purchaser for a valuable consideration.    (*Farrington* v. *Sexton*, 43 Mich. 456; *Chace* v. *Chapin*, 130 Mass. 131.)    The courts of the state of New York and of the other states in which this statute has been adopted in substance have universally held that a fraudulent intent on the part of the assignor is sufficient to vitiate the assignment, although the assignee is not a party to such fraudulent intent.    (*Griffin* v. *Morquardt*, 17 N. Y. 28; *Meade* v. *Phillips*, 1 Sandf. Ch. 83; *Rathburn* v. *Platner*, 18 Barb. 272; *Gove* v. *Murphy*, 6 Minn. 305; *Loos* v. *Wilkinson*, 18 N. E. 99; *Stearn* v. *Kelley*, 88 N. Y. 418; *Young* v. *Henderson*, 66 N. Y. 382; *Savage* v. *Knight*, 53 Am. R. 423; Burrill on Assignments, § 307, and cases cited; *Swartz* v. *Hazlett*, 8 Cal. 128; *Ter.* v. *Figg*, 37 Cal. 328; *Judson* v. *Tyford*, 84 Cal. 508; *Peters* v. *Bane*, 133 U. S. 670.)

VI.   The jury found that the assignors fraudulently withheld and concealed property from the assignee.   The jury also found that on the 1st day of February, 1892, the inventory amounted to $57,564.30, and that it should have amounted to $120,000.   These findings alone are sufficient to establish a fraudulent intent on the part of the assignors and to vitiate the assignment.   (*Farrington* v. *Sexton*, 43 Mich. 456; *Coursey* v. *Morton*, 132 N. Y. 556; *Smith* v. *Mitchell*, 12 Mich. 180;

*Farrington* v. *Sexton,* 43 Mich. 454; *Hubbard* v. *McNaughton,* 43 Mich. 220; *Baun* v. *Pierce,* 7 S. R. 548; *Ailsworth* v. *Dran,* 12 Pac. 241; Burrill on Assignments, chapter 19; § 226, Fifth Division of the Compiled Statutes.)

DE WITT, J.—It is not often that as full and elaborate find- ings of fact are made in a case as those now before us. The trial involved volumes of figures and days of testimony upon questions of fact. The findings treated all these questions of accounts, and the jury gave mathematical results which would lead one to believe that they were found by a "struck jury" of accountants.

Since the case was argued in this court we have spent many days in reviewing the testimony. We would have been aided by specifications of alleged errors of a different character than those contained in the statement on motion for a new trial in this case. We do not purpose to disregard the specifications, or to hold that they are insufficient. We express no opinion upon that subject. But, when a specification is stated as follows: "There is no evidence to sustain finding No. 2, that," —then giving a statement of the finding, and when every specification is similar to this instance cited, it is a great labor for a court to go through 800 pages of record to ascertain whether it is true that there is no evidence to sustain any of the findings. When a case has been tried for 21 days, before a court of general jurisdiction, producing such a record as this before us, and findings are made and adopted by the court, there would seem to be some presumption that some evidence had been introduced in the case tending to support the findings. But, notwithstanding the form of the specifications, we have read the testimony, and examined it with great diligence. We are prepared to say that there is evidence to sustain the findings. Having satisfied our own minds to that effect, we see no profit in giving in this opinion a review of the testimony. It would not be valuable as a precedent. The case was tried at great length before "a jury of unusual intelligence." The two learned judges of the district court pre-

sided at the trial and adopted the findings. The testimony was to a great extent of a technical character, and as to mercantile accounts, transactions, and facts, upon which subjects a jury of intelligent business men are perhaps as competent to form a judgment upon the facts as is a court that has not heard the witnesses testify, or observed their demeanor.

The great issue in this case was fraud. The existence of fraud was determined by an overwhelming line of findings by the jury. See statement of the case preceding this opinion. Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know "whence it cometh and whither it goeth." It "loveth darkness rather than light, because its deeds are evil." It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. When we so discover it, the search light of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodsman follows his game by slight indications, as a broken twig or a displaced pebble, so fraud may become apparent by innumerable circumstances, individually trivial, perhaps, but in their mass "confirmation strong as proofs of holy writ." The weight of isolated items tending to show fraud may be "as light as the shadow of drifting snow," but the drifting snow in time makes the drift, the avalanche, the glacier. Fraud may hang over the history of the acts of a man like the leaden-hued atmosphere upon the house of Usher, "faintly discernible but pestilent, an atmosphere which has no affinity with the air of Heaven." Under this atmospheric pressure of fraud the jury in this case lived and breathed for the 21 days of the trial. We have followed them through the history of those days, as it is transmitted to this court in the record. We have not the advantage of breathing and seeing and hearing which they had. The district court had that advantage, and agreed with the findings of the jury. We are of opinion that, under

these circumstances, the evidence is not so insufficient that we should disturb the result.

In accordance with our views as to the proof of fraud, we note the following from Bump on Fraudulent Conveyances (page 759): "In questions of fraud a wide range of evidence is allowed. Fraud assumes many shapes, disguises, and subterfuges, and is generally so secretly hatched that it can only be detected by a consideration of facts and circumstances which are not unfrequently trivial, remote, and disconnected. To interpret their meaning, or the full meaning of any one of them, it may be necessary to bring them together and contemplate them all in one view. In order to do this it is necessary to pick up one here and another there until the collection is complete. A wide latitude of evidence is therefore allowed, in order that fraud may be detected and exposed."

We will add, here, however, that the testimony as to fraud in the conveyances by Greenhood to Barnett and Weil, and the testimony as to the participation in the fraud by Kahn, assignee, is not wholly satisfactory to our minds. But it seems to have satisfied the jury. They saw Greenhood, and Barnett, and Weil, and Kahn, and heard them testify. We have not. In view of the whole case, we do not feel called upon to disturb these findings.

It was held in *Ming* v. *Truett*, 1 Mont. 322, that the court will not reverse a judgment if the testimony is conflicting, even though the weight of evidence appears to be against the findings of the court below. This court will not disturb the findings or verdict, if there is substantial evidence to support the same, even though the evidence is conflicting. (*Lincoln* v. *Rodgers*, 1 Mont. 217; *Travis* v. *McCormick*, Id. 347: *Davis* v. *Blume*, Id. 463; *Griswold* v. *Boley*, Id. 545; *Kinna* v. *Horn*, Id. 597; *Toombs* v. *Hornbuckle*, Id. 286; *Kleinschmidt* v. *Dunphy*, Id. 124; *Parchen* v. *Peck*, 2 Mont. 570; *Vantilburgh* v. *Hamilton*, Id. 413; *Orr* v. *Haskell*, Id. 225; *Knox* v. *Gerhauser*, 3 Mont. 276; *Story* v. *Black*, 5 Mont. 26; *Railway Co.* v. *Warren*, 6 Mont. 275; *Beck* v. *Beck*, 6 Mont. 285; *Ramsey* v. *Cattle Co.*, 6 Mont. 501; *Budd* v. *Perkins*, 6 Mont.

223; *Diamond* v. *Northern Pacific R. Co.*, 6 Mont. 586; *Territory* v. *Reuss*, 5 Mont. 607; *Kennon* v. *Gilmer*, 5 Mont. 273, Id., 9 Mont. 110; *Frank* v. *Murray*, 7 Mont. 4; *Ingalls* v. *Austin*, 8 Mont. 333; *Fitschen* v. *Thomas*, 9 Mont. 52.) These are some of the older cases decided by this court under the territorial government. The same rule has obtained under the state organization.

It was said in the recent case of *Brownfield* v. *Bier*, 15 Mont. 403 : " When there is a substantial conflict in the evidence, and that conflict has been resolved by the district court, and the district court has denied a motion for a new trial, this court will not disturb the result. This doctrine has been so persistently announced by this court for 26 years that it may be considered as the settled rule in this jurisdiction." The decisions of this court from its organization to the present time are full declarations of this principle of practice. We shall, therefore, accept the findings as made, and proceed to the discussion of the questions of law presented by the appellants.

The assignment for the benefit of creditors was made February 12, 1892, plaintiff here being the third preferred creditor. On February 13th this plaintiff commenced an action against Greenhood, Bohm & Co. on a money demand for $33,500. A writ of attachment was issued, and levy made by the sheriff February 15th. On April 8th a judgment was rendered for plaintiff in that case for $35,945.48. On February 24th Max Kahn, assignee, began an action against the sheriff (Jefferis) and the plaintiff herein, for the conversion of the goods seized under the writ issued in the case of *Merchants' National Bank* v. *Greenhood, Bohm & Co.* The defendants in that action of Kahn against Jefferis and the bank justified in their answer under the writ of attachment. Replication was filed, issue made, and the case was ready for trial before the issues in the case now before us were made up. This case now before us was commenced April 21st. It and the case of Kahn against Jefferis and the bank were set for trial for the same day. In this case the issue was fraud in the

assignment, and all the parties were before the court,—the bank, the assignors, and the assignee.  *In Kahn* v. *Jefferis et al.* there was a legal cause of action and the equitable defense of fraud in the assignment; but in that case Greenhood and Bohm were not parties, and were not before the court. The court determined that the whole matter could be more fully tried in the action in which it found all the parties.  For that reason it tried this case prior to that of *Kahn* v. *Jefferis et al.* An elaborate argument was made in this court, counsel contending that this action of the district court was error.  But we need not follow the counsel into that argument, for the reason that they have strayed far from the point decided by the district court.  To ascertain that point we quote as follows from the record :   '' That thereafter, on the 16th day of January, 1893, this cause coming on for trial, the defendants objected to said cause being tried at said time, for the reason that the case of *Max Kahn* v. *C. M. Jefferis* and *Merchants' National Bank* preceded it upon the calendar, and should be tried first in its order.''   It thus appears that the only objection which the defendants made to the trial of this case prior to the case of Kahn against Jefferis and the bank was that the Kahn case preceded this case upon the docket, and for that reason should be tried first.   The counsel, upon the argument before us, stated that they abandoned that point, and conceded that the court had the right to control its own docket and the order in which it may try cases.   As this is the only point presented in the objection to the district court, there is nothing else for us to pass upon, and we are disappointed in not being able to accompany counsel in their diligent and learned research into the questions not raised by the record.

Before proceeding to examine what we consider the important question of law in this case, there are a few small matters which may be cleared up *in limine.*

Two matters which were relied upon in the complaint are abandoned by the respondent, namely, the question of Rejall's partnership in the firm of Greenhood, Bohm & Co., and also the question of the laws of the state of Washington.   The al-

leged insufficiency in the description of the property assigned is also a matter which is not relied upon, and, furthermore, seems to be settled by the decision of *McCulloch* v. *Price*, 14 Mont. 320. Again, on the question of the preferences to Rejall and Westheimer and Bach, Cory & Co. being in excess of the amount actually due them, it was found by the jury that they were in good faith, and this is not a subject upon which the court below rendered its judgment. These matters have all, therefore, been passed.

That which we consider the important question in this case is what the appellants call the want of equity in plaintiff's cause of action. The appellants contend that facts are not pleaded or found which entitle the plaintiff to the equitable relief demanded in its complaint and granted by the court. The plaintiff bank was a large creditor of Greenhood, Bohm & Co. Greenhood, Bohm & Co. made the assignment. The following day the bank brought the action at law hereinbefore described against Greenhood, Bohm & Co., and levied an attachment upon the assigned goods. When the bank obtained its judgment in that cause it found this situation : It had a large quantity of goods attached. These goods were included in the assignment, which the bank claimed was fraudulent. The assignee was asserting the right of possession to the goods, and, furthermore, had brought an action against the sheriff and the bank for the alleged conversion of these goods. The bank in its money-demand suit issued an execution. The sheriff, with the execution in his hands, found this condition of affairs which we have detailed. He returned the execution in the following language : "No property to be found in my county to satisfy the foregoing execution, except the property attached herein, and embraced in the alleged assignment from Greenhood, Bohm & Co. to Max Kahn on the 12th day of February, 1892, and except the above garnishments, and I herewith return the said execution unsatisfied." There is no point made as to the garnishments mentioned in the sheriff's return, as they were in trifling amounts. The plaintiff in the law case, to wit, the bank, then commenced this equity action, which resulted in the find-

ings and judgment recited in the statement preceding this opinion.  Does the plaintiff thus appear to be entitled to equitable relief?  This is the vital question in the case, and the one around which the battle has been waged.

This is not the sort of a creditors' bill which seeks the discovery of assets or equitable interests not subject to levy and sale.  It is, on the other hand, an action to set aside a fraudulent obstruction to plaintiff's realizing fully and successfully upon its judgment.

The counsel for appellants cite innumerable authorities upon the principle that the legal remedy must be first exhausted, and that execution must be returned *nulla bona.*   Here the execution was not returned *nulla bona,* but it returned the facts, to wit, the existence of the fraudulent obstruction to the execution.   We find that the' authorities sustain the bringing of an equitable action under circumstances similar to those of the case at bar.   In this case, judgment was obtained at law by the plaintiff before it brought this suit.   The plaintiff was therefore in a position of a judgment creditor with a liquidated demand.   The authorities to the effect that the creditors' bill cannot be brought until judgment is obtained are therefore not applicable.   The resort to equity in this case was not a resort to simply aid an attachment, although some cases hold that even a simple attachment without judgment may be aided by creditors' bill.  (Pom. Eq. Jur. §415, note on page 125.)  As noted before, the action is to remove a fraudulent obstruction, and was brought after the judgment at law was obtained.  We are of the opinion that the weight of the better authority is in favor of sustaining such action.   The contention over this point has been so earnest and persistent, that we shall proceed to quote from the authorities with some liberality.

We make the following quotations:   "The jurisdiction of equity to entertain suits in aid of creditors undoubtedly had its origin in the narrowness of the common-law remedies by writs of execution.   These writs, issued by courts of common law, besides being otherwise limited in their operations, were of course confined to those estates and interests recognized by

the law, and did not extend to estates and interests equitable in their nature. Creditors' suits were therefore permitted to be brought in those instances where the relief by execution at common law was ineffectual,—as for a discovery of assets, to reach equitable and other interests not subject to levy and sale at law, and to set aside fraudulent conveyances and obstructions. Statutes in England and in certain American states have greatly extended the scope of writs of execution, thereby providing for adequate legal relief in cases where, formerly, resort to equity was necessary, and even extending the relief to instances where, perhaps, a creditors' bill would not lie. In other states, statutes have increased the efficiency of creditors' suits by dealing with the subject directly. It is a necessary result from the whole theory of the creditors' suits that jurisdiction in equity will not be entertained where there is a remedy at law. The general rule is, therefore, that a judgment must be obtained, and certain steps taken towards enforcing or perfecting such judgment, before a party is entitled to institute a suit of this character. In this there is a uniformity of opinion, but the difficulty arises in determining exactly how far a plaintiff should proceed after he has obtained his judgment. It is, of course, necessary for the creditor to allege and prove that he has taken the necessary proceedings at law before he can show a case requiring the interposition of equity. Whether an equitable suit, analogous to the creditor's suit, will be allowed in aid of the lien created by an attachment before the recovery of judgment, is a question to which the American courts have given directly conflicting answers." (3 Pomeroy's Equity Jurisprudence, § 1415.) This case at bar is one of those described by Pomeroy as one "to set aside fraudulent conveyances and obstructions." See the authorities cited to this text in note 3.

We find the following in 2 Beach on Modern Equity, §§ 883, 885. Section 883: "A court of equity will aid a judgment creditor to reach the property of his debtor by removing fraudulent judgments or conveyances or transfers which defeat his legal remedy at law, and will also aid him where the

debtor's property consists of choses in action and mere equitable interests not liable to be sold on execution; and where a debtor transfers his property in fraud of creditors, an injunction may be granted as incidental to the relief sought by the creditors' bill, and will, if necessary, grant him a double relief under one bill by removing the fraudulent obstruction in the way of his execution, and also at the same time enabling him to reach his debtor's equitable assets. If, when the bill was filed and execution returned unsatisfied, there was property within the creditor's knowledge subject to levy on execution the bill cannot be sustained." Section 885: "A creditors' bill may be entertained if the legal remedy is not in all respects as plain and satisfactory as that afforded by equity. For example: a bill may often afford a better remedy than a garnishment against a fraudulent transferee, because on recovery a court of equity would be the more appropriate forum for distributing the fund among numerous claimants." Note 1: "Thus in *Boyce's Ex'rs* v. *Grundy*, 3 Pet. 210, it was said: 'It is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.'"

It seems to us quite clear in this case that the remedy at law was not at all as practical and efficient as the remedy in equity. In the money-demand action of the bank against Greenhood, Bohm & Co., the assignee, Max Kahn, was not a party, and in the action for a conversion by Kahn against Jefferis and the bank, Greenhood and Bohm were not parties; but in the case at bar every one was before the court, and the rights of every one could be finally determined.

We find the following pertinent remarks in 2 Freeman on Executions, § 424: "The objects which may be accomplished by proceedings in equity to obtain satisfaction of a judgment at law are three: (1) A full and complete discovery may be obtained of all the defendant's assets, and when discovered they may be compelled to contribute to the payment of the plaintiff's judgment. (2) Equitable and various other assets,

not subject to levy and sale at law, may be sold under the direction of chancery, and the proceeds applied to the payment of the plaintiff's debt. (3) Various obstructions may be removed from property liable to seizure and sale at law, and by their removal the plaintiff's legal remedy may be made far more certain and efficient than it would otherwise be. (4) The complainant may, in effect, assert for his benefit a cause of action existing in favor of the judgment debtor, and which the latter neglects or refuses to assert. Under the third subdivision fall that numerous class of cases in which property has been made the subject of liens and transfers made to defraud creditors. In such a case, the creditors may proceed to levy and sell as if no such lien or transfer existed. Their remedy at law is nevertheless seriously obstructed, because few persons can be found willing to purchase property at execution sales, and take upon themselves the burden and the risk of contesting with adverse claimants. A creditor is therefore allowed to go into equity to test the validity of claims which interfere with his rights, and which he believes to be founded in fraud. Upon a proper showing, equity will remove a fraudulent transfer, or mortgage, or judgment, or other lien, or clear away a cloud from the title. * * * While fraud is a more frequent ground for the removal of obstructions than any other, it is not an indispensable ground. The mere fact that there is an apparent obstruction calculated 'to inspire doubt and apprehension in the mind of purchasers, and thus prevent them from bidding upon the property,' is generally sufficient to warrant equity in decreeing its removal. * * * Whatever may be requisite to prevent the plaintiff's suit from proving abortive will generally be done, provided it is not beyond the relief which equity is competent to extend. Very frequently the property sought to be reached by the bill is taken into the possession of the court, and a receiver appointed for its protection and management. Usually there is great danger that the property sought to be reached by the bill will be transferred by the defendant to some third person, or will by some other means be placed in a situation where it will be either

difficult or impossible to make it answerable to the decree which may ultimately be entered in the case. Hence, it is usual, at or very soon after the filing of the bill, to obtain an injunction to prevent the defendant from making any disposition of his property which would tend to make the suit ineffectual. While the necessity of an injunction against a transfer of the defendant's property may be more frequent and obvious than any other, yet this is by no means the only occasion for the use of this preventive relief in connection with creditors' suits. Whatever may be the wrong threatened, if it be of such a character that its perpetration will render the suit wholly or partly ineffectual, as in case of the removal or destruction of the property, an injunction will issue. If a fraudulent obstruction has been interposed to hinder or delay the plaintiff at law, he sometimes does not ask equity to do anything beyond removing such obstruction, for when it is removed the plaintiff may safely proceed at law under his execution. But the more usual practice, both in proceedings to remove fraudulent obstructions, and in proceedings to reach property not subject to execution at law, is to obtain the appointment of a receiver, and thereby bring the property within the custody and control of the court. If the property consists of real estate, the defendants are required to execute a conveyance to the receiver. If it consists of personalty, the title vests in him by virtue of his appointment. After he has been vested with the title, the receiver collects, manages, and disposes of the property as directed by the orders and decrees of the court; and the plaintiff, when entitled thereto, obtains satisfaction out of the funds realized by the receiver.'' The practice as suggested in Freeman is that which was observed in this case. A receiver was appointed, who collected and disposed of the property and retains the proceeds thereof subject to the judgment of the court.

We note the following from *Tappan* v. *Evans*, 11 N. H. 327: ''The general principle, deducible from the authorities applicable to this case, is that where property is subject to execution, and a creditor seeks to have a fraudulent convey-

ance or obstruction to a levy or sale removed, he may file a bill as soon as he has obtained a specific lien upon the property, whether the lien be obtained by attachment, judgment, or the issuing of an execution. But if the property is not subject to levy or sale, or if the creditor has obtained no lien, he must show his remedy at law exhausted, by an actual return upon his execution that no goods or estate can be found (which is pursuing his remedy at law to every available extent), before he can file a bill to reach the equitable property of the debtor. (*McDermott* v. *Strong*, 4 Johns. Ch. 687; *Williams* v. *Brown*, Id. 682; *Brinckerhoff* v. *Brown*, Id. 676; *Spader* v. *Davis*, 5 Johns. Ch. 280; *Beck* v. *Burdett*, 1 Paige 305; *Child* v. *Brace*, 4 Paige 310; *Dodge* v. *Griswold*, 8 N. H. 425; *Hadden* v. *Spader*, 20 Johns. 554; *Weed* v. *Pierce*, 9 Cow. 722; *McElwain* v. *Willis*, 9 Wend. 548, 560, 561, 566.) The same principle seems to be recognized in North Carolina and Kentucky. See cases cited in 1 Ben. & H. Dig. 348, 353.'' In addition to the remarks made in the New Hampshire case just cited, it is always to be remembered that, in the case at bar, we have not only the attachment but the judgment and the return of the execution stating the facts of the obstruction.

We find the following language in the case of *Tuck* v. *Olds* in the United States circuit court for the state of Michigan, 29 Fed. 738: ''But while I do not think the bill could be sustained on this ground, still I think it may be as one filed to remove an obstruction to the execution. * * * The principle upon which this class of creditors' bills rests is that the defendant, by some inequitable proceeding, has put an obstruction in the way of complainant's realizing his just satisfaction out of the property of the defendant levied on. The obstruction must be one calculated to inspire doubt and apprehension in the minds of purchasers, and thus prevent them from bidding upon the property, whereby the process is paralyzed. In such a case the complainant has no adequate remedy at law. (*Beck* v. *Burdett*, 1 Paige 305; *Jones* v. *Green*, 1 Wall. 330; *Thayer* v. *Swift*, Har. (Mich.) 430, 433.''

In an old case in New York, in 1829, Chancellor Walworth says: "There are two classes of cases where a plaintiff is permitted to come into this court for relief, after he has proceeded to judgment and execution at law without obtaining satisfaction of his debt. In one case the issuing of the execution gives to the plaintiff a lien upon the property, but he is compelled to come here for the purpose of removing some obstruction, fraudulently or inequitably interposed to prevent a sale on the execution. In the other, the plaintiff comes here to obtain satisfaction of his debt out of property of the defendant, which cannot be reached by execution at law. In the latter case, his right to relief here depends upon the fact of his having exhausted his legal remedies, without being able to obtain satisfaction of his judgment. In the first case, the plaintiff may come into this court for relief, immediately after he has obtained a lien upon the property by the issuing of an execution to the sheriff of the county where the same is situated; and, the obstruction being removed, he may proceed to enforce the execution by a sale of the property, although an actual levy is probably necessary to enable him to hold the property against other execution creditors or *bona fide* purchasers. *Angell* v. *Draper*, 1 Vern. 399, and *Shirley* v. *Watts*, 3 Atk. 200, are cases of this description. In the first, a fraudulent assignment was interposed to prevent a sale of the defendant's property on execution; and in the last case it became necessary to redeem a term of years in a leasehold property from a lien of a prior mortgage. In both these cases the plaintiffs were allowed to come into equity for relief before the executions were returned unsatisfied." (*Beck* v. *Burdett*, 1 Paige 305.)

In the United States circuit court of Missouri, we have the following: "The general rule of equity, as contended for by respondents, is that before the general creditor can resort to a court of equity to reach his debtor's property held under a fraudulent deed and the like, he must reduce his claim to judgment, issue execution, and have a return of *nulla bona*. In other words, he must exhaust his legal remedies. The reason

of this rule, requiring a judgment, etc., is that the claim must be rendered certain; otherwise, the proceeding to vacate the fraudulent transfer of the title, and to remove obstacles placed in the way of the successful operation of the execution, might be entirely fruitless if, after all, the debtor failed to obtain a judgment on his claim.   \*   \*   \*   Where the reason of the rule ceases, the rule itself ought not longer to operate.   In this case the claim was not only certain, but it had back of it a judgment conclusive and binding, and, under the law of the forum where the attachment suit was instituted, the complainant had secured and fixed his lien upon the real estate.   Why should it, then, be compelled to proceed to execution, when all the purchaser could obtain by a sale thereunder would be a lawsuit, before he could get rid of the legal title of the respondents?"   (*Chicago & A. Bridge Co.* v. *Anglo-American Packing and Provision Co.*, 46 Fed. 584.)

We quote as follows. from the supreme court of New Hampshire   " The object of the plaintiff's bill, although somewhat inartificially drawn, was clearly twofold :   First, to remove out of the way of the levy of the Waldron execution, belonging to the plaintiff, all fraudulent mortgages and conveyances of William H. Sheafe's interest in the Jacob Sheafe farm; and, secondly, to obtain from the court a decree which should secure to the plaintiff a lien upon that interest for the payment of the sums due and to become due to her annually as alimony, under the decree of the superior court, July term, 1852, ordering said William H. Sheafe to pay her the sum of $150 per annum for that purpose.   In the opinion delivered in this case at the adjourned term in March last, we recognize the validity of plaintiff's claim for relief on both these grounds.   Upon the first point we remarked :   'The general principle deducible from the authorities seems to be that, where property is subject to execution and a creditor seeks to have a fraudulent conveyance or obstruction to a levy or sale set aside or removed, he may file and maintain a bill for that purpose as soon as he has obtained a specific lien upon the property, whether by attachment, judgment, or the issuing of an execu-

tion.' (*Tappan* v. *Evans*, 11 N. H. 327, and cases cited; *Iron Co.* v. *Goodall*, 39 N. H. 223.)" *Sheafe* v. *Sheafe*, 40 N. H. 517.

The New Jersey court of chancery expresses the following view : "But all the cases proceed upon the principle that the judgment creditor, in order to be entitled to the aid of a court of equity in enforcing his remedy by removing obstructions from his path, must have acquired title to or a lien upon the specific thing against which he seeks to enforce his judgment. He must complete his title at law before coming into equity. Unless he has established his title to or lien upon the property of his debtor, he has no right to interfere with his debtor's disposition of it. Such lien the creditor does acquire under our law by the service of the writ of attachment. The law recognizes the claim of the attaching creditor after it has been verified by affidavit as prescribed by the statute, as a subsisting debt, for the purpose of creating the lien. Having that lien by authority of the statute, prior to the recovery of judgment, he is entitled to the aid of a court of equity to enforce his legal right. The statute for various purposes recognizes and enforces this right, although it may be that the claim may eventually prove to be unfounded. The objection to the interference of a court of equity, that the claim of the attaching creditor is not ascertained, if it be entitled to any consideration, can have no application in the present case, for the plaintiff's claims against the defendant have in fact been established by judgment." (*Robert* v. *Hodges*, 16 N. J. Eq. 304.)

A decision which is often quoted is that of the case of *Case* v. *Beauregard*, 101 U. S. 688, in which the court says : "It is no doubt generally true that a creditor's bill to subject his debtor's interests in property to the payment of the debt must show that all remedy at law had been exhausted. And, generally, it must be averred that judgment has been recovered for the debt, that execution has been issued, and that it has been returned *nulla bona*. The reason is that, until such a showing is made, it does not appear in most cases that resort to a court of equity is necessary, or, in other words, that the

creditor is remediless at law. In some cases, also, such an averment is necessary to show that the creditor has a lien upon the property he seeks to subject to the payment of his demand. The rule is a familiar one that a court of equity will not entertain a case for relief where the complaint has an adequate legal remedy. The complaining party must, therefore, show that he has done all that he could do at law to obtain his rights. But, after all, the judgment and fruitless execution are only evidence that his legal remedies have been exhausted, or that he is without remedy at law. They are not the only possible means of proof. The necessity of resort to a court of equity may be made otherwise to appear. Accordingly the rule, though general, is not without many exceptions. Neither law nor equity requires a meaningless form. '*Bona sed impossibilia non cogit lex.*' It has been, decided that, where it appears by the bill that the debtor is insolvent, and that the issuing of an execution would be of no practical utility, the issue of an exexecution is not a necessary prerequisite to equitable interference. (*Turner* v. *Adams*, 46 Mo. 95; *Postlewait* v. *Howes*, 3 Iowa 365; *Ticonic Bank* v. *Harvey*, 16 Iowa 141; *Botsford* v. *Beers*, 11 Conn. 569; *Payne* v. *Sheldon*, 63 Barb. 169.) This is certainly true where the creditor has a lien or a trust in his favor. So it has been held that a creditor, without having first obtained a judgment at law, may come into a court of equity to set aside fraudulent conveyances of his debtor, made for the purpose of hindering and delaying creditors, and to subject the property to the payment of the debt due him. (*Thurmond* v. *Reese*, 3 Ga. 449; *Cornell* v. *Radway*, 22 Wis. 260; *Sanderson* v. *Stockdale*, 11 Md. 563.) * * * The foundation upon which these and many similar cases rest is that judgments and fruitless executions are not necessary to show that the creditor has no adequate legal remedy. * * * But, without pursuing this subject further, it may be said that, whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting legal processes or remedies. (*Tappan* v. *Evans*, 11 N. H. 311; *Holt* v. *Bancroft*, 30 Ala. 193.) In-

deed, in those cases in which it has been held that obtaining a judgment and issuing an execution is necessary before a court of equity can be asked to set aside fraudulent dispositions of a debtor's property, the reason given is that a general creditor has no lien. And when such bills have been sustained without a judgment at law, it has been to enable the creditor to obtain a lien, either by judgment or execution. But when the bill asserts a lien or a trust, and shows that it can be made available only by the aid of a chancellor, it obviously makes a case for his interference.''

Upon the argument of this case our attention was called to an alleged conflict in the decisions from the court of appeals of New York, counsel citing *Thurber* v *Blanck*, 50 N. Y. 80, and *Mechanics'*, etc., *Bank* v. *Dakin*, 51 N. Y. 519; but the recent case of *People ex rel Cauffman* v. *Van Buren* discusses these cases and states the doctrine as follows:

"In *Thurber* v. *Blanck*, 50 N. Y. 80, it was held that an attaching creditor had no standing in court to reach equitable assets until his remedy at law was exhausted, nor to attack a fraudulent transfer of the property of his debtor until after judgment; and in *Mechanics'*, etc., *Bank* v. *Dakin*, 51 N. Y. 519, the commission of appeals held that an attaching creditor, after the recovery of judgment and the issuing of execution, may maintain an equitable action in his own name to set aside a fraudulent transfer of the property which had been seized under the attachment. The impression seems to have prevailed that there was an irreconcilable conflict between these two cases, and the reporter, in a foot note in 51 N. Y., says: 'This case, it will be perceived, was argued prior to the decision of the case of *Thurber* v. *Blanck*, 50 N. Y. 80, with which it is in conflict. That case had not been brought to the attention of the commission at the time of the decision herein.' But we fail to discover any real ground of antagonism between them. In *Thurber* v. *Blanck* the court was dealing with an attempt on the part of an attaching creditor to reach equitable assets, which it has been uniformly held cannot be done until judgment has been recovered, execution issued and returned unsat-

isfied, and an action or proceeding in the nature of a creditors' bill instituted. The provisions of the Revised Statutes (now §§ 1871-1879 of the Code) which authorized a judgment creditors' action, imperatively required the recovery of a judgment and the issue and return of an execution unsatisfied as an indispensable condition of the creditor's right to bring the action.

"In *Mechanics', etc., Bank* v. *Dakin*, the attaching creditor had, by the recovery of judgment and the issue of execution, acquired the right to have the attached property applied to the satisfaction of the execution, but in the assertion of this right he found the way obstructed by the interposition of a conveyance of the property by his debtor, which was apparently valid but which was in fact void. In such cases it has always been held that, while the process for the collection of the debt was outstanding, the equitable jurisdiction of the court could be invoked to remove the fraudulent obstruction to the legal process and permit it to be effectually enforced." (136 N. Y. 259, 32 N. E. 775.)

Counsel for appellants have relied, among other cases, upon *Buckeye Engine Co.* v. *Donau Brewing Co.*, 47 Fed. 6. That case seems to have decided that a creditors' bill cannot be maintained upon a judgment on which execution was issued and returned unsatisfied, when the return does not expressly show that there was no property subject to levy. But that decision is not in conflict with the principles announced in the above-quoted cases. As we have tried to make clear throughout this discussion, this is not the sort of a creditors' action where the showing that there was no property subject to execution was of great importance, when the return in fact showed the existence of the obstruction which the creditors wished to have removed. It is even held in the state of Washington that the obtaining of judgment is not a prerequisite to equitable interference. Of course, we are not required to go that far in this case, and we mention the Washington case only to show the tendency, perhaps, to extend equitable aid. The Washington court uses the following language: "The first questio

that presents itself in this case is, is it necessary to reduce a claim to judgment, issue an execution and secure a return of *nulla bona* made thereon, to support a creditors' bill, or is an attachment lien a sufficient basis for such an action? Many cases have been cited both by appellant and respondents on this proposition, and from an investigation of the cases it must be conceded that the weight of opinion, considering both the old cases and the new, sustains the doctrine that the claimant must press his claim to judgment, send out his execution, and show a fruitless search for property before he can appeal to a court of equity to set aside a fraudulent conveyance. But we are satisfied that the trend of modern decision is the other way. At all events, the decisions of courts are so conflicting that this court feels justified in adopting that rule which seems to it best calculated to protect the interests of *bona fide* creditors from fraudulent transactions. We think no good purpose can be subserved by compelling a creditor to await his judgment, but that the effect will be to aid dishonest debtors in fraudulently disposing of their property. And, especially in view of the language used by the supreme court of the territory in *Meacham Arms Co.* v. *Swartz*, 2 Wash. T. 412, 7 Pac. 859, and *Thompson* v. *Caton*, 3 Wash. T. 31, 13 Pac. 185, we feel justified in now deciding that, where a lien has been obtained by attachment on the property in controversy, and it appears by bill that the debtor is insolvent, and the issuing of an execution would be of no practical utility, the obtaining of the judgment and the issuance of an execution thereon is not a necessary prerequisite to equitable interference.'' (*Benham* v. *Ham*, 5 Wash. 128; 34 Am. St. Rep. 852.) See, also, *Williams* v. *Michenor*, 11 N. J. Eq. 520.

As looking in the direction of the authorities above quoted, we cite as follows from *Leopold* v. *Silverman* 7 Mont. 266: ''The most important one of the incidental questions presented in the record is this: Should the judgment on the pleadings have been rendered in favor of the defendants because the plaintiffs had a plain, speedy, and adequate remedy at law? Let us first inquire whether or not the plaintiffs had such a le-

gal remedy.   If both the first and second mortgages are void on their face, as is alleged in the plaintiff's pleadings, there can be no doubt that they had a remedy at law by an action of claim and delivery under our statute for the possession of the property.   But does this fact preclude them from bringing a suit in equity to set aside the prior mortgages for fraud, and to foreclose the subsequent mortgage, and, incidentally, of course, to have a receiver to preserve and dispose of the property and distribute the proceeds under the direction of the court?   In states where the two jurisdictions of law and chancery are strictly separated, and relief is administered in different courts or by the same court sitting in different capacities, this question might be answered in the affirmative. But in the territories of the United States there is only one court to try all causes, whether legal or equitable, and the blended system prevails to its fullest extent as established by acts of congress.''

Innumerable other cases might be cited.   Those from which we have quoted seem to be representative, and state the doctrine clearly and satisfactorily.   As heretofore observed, the appellants have cited many authorities upon the subject of creditors' bills, but those cases treat of facts different from those in the case at bar, and of creditors' bills of a nature other than that set up in this complaint.   We are perfectly satisfied that, under modern views of equity jurisprudence, the action will lie to remove a fraudulent obstruction to the reasonable success of plaintiff in realizing upon its attachment lien when it has reduced its claim to judgment and it appears that the said obstruction to the fairly successful execution of judgment exists.   We are of the opinion that it would not be reasonable or equitable for a court of chancery to turn away such a plaintiff, and require it to go to its remedy at law and sell property and to breed a swarm of actions, some of which would later have to be finally settled in equity, when this one action may finally dispose of all of the contentions.   There may be cases which hold views contrary to those which we have expressed.   We do not purpose to review those cases.

We have satisfied our own mind upon the conclusions which we have reached, both in reason and upon authority.

It is argued by appellants that, by issuing an execution and its being returned unsatisfied, the plaintiff abandoned its attachment lien. The district court, upon this subject said: "This contention impresses us as somewhat frivolous. In the whole litigation nothing is clearer than the fact that the plaintiff has clung with the utmost tenacity to this lien, both as a matter of intent, and from a legal standpoint." We, also, are of the opinion that this contention of the appellant is not substantial. If it is argued that the respondent abandoned its attachment lien as a matter of fact, this is not true. Abandonment is a question of intent. Intent is ordinarily proved by acts. The acts of respondent certainly indicate that it was far from abandoning the attachment lien. It issued an execution, which execution at once encountered a fraudulent obstruction. Instead of abandoning the attachment in fact, the respondent at once came into the court of equity to render more completely available its attachment lien. If it be contended that the respondent by its acts abandoned, as a matter of law, the attachment lien, the contention is settled by the views which we have heretofore expressed, in treating of the subject, as the appellants call it, of the alleged want of equity in the case. As to the return of the execution, it stated the exact facts, and the facts as we have determined, upon which the equity action may rest. Upon the contention that the attachment lien was abandoned, see the case of *People ex rel Cauffman* v. *Van Buren,* 136 N. Y. 259, in which the court says, on page 260: "It would seem to be illogical to accord to the plaintiff the right to attach property fraudulently transferred, as he concededly may under the decisions in *Hall* v. *Stryker,* 27 N. Y. 596, and the other cases cited above, and yet deny him the right to have the lien preserved until he can merge his claim in a judgment and issue final process for its collection. No adequate remedy at law can be suggested in such a case."

Again, the appellants contend that, if the assignment is to be set aside in this action, the only judgment proper to render

would be one marshaling the assets and requiring all the creditors to come in and prove their claims, to the end that they might share *pro rata* in the funds, and that the plaintiff has no lien prior to any of the creditors. The appellants claim that the judgment should therefore be modified. But they make this claim upon the ground that the respondent abandoned its attachment lien. That point we have already decided against them, and with that falls also their contention that the judgment should be modified. This is not a case where the plaintiff claims a priority because it first brought its suit to discover assets. We think that we have heretofore made it plain that that is not the nature of the action, but, on the other hand, it is an action to remove the fraudulent obstruction.

The appellants allege error in the action of the court in allowing testimony as to statements made by the assignors some days after the assignment was executed, and after possession had been delivered to the assignee. We shall not approve or disapprove the ruling of the court in this respect. It is important to observe what was the character of this testimony, and what was its materiality, in order to ascertain whether this error, if error it were, was sufficiently prejudicial to reverse the case. L. H. Hershfield, president of the plaintiff bank, was first interrogated as to conversations preceding the assignment. He was then allowed to testify as to conversations between Greenhood and Bohm and himself after the assignment. His testimony in this respect was as follows: "I objected to their assignment, and they said they did the best they could, and in that line evidently they had no use for me. They said they were disappointed in the action that had been taken, that they were in hopes that they could borrow from Rejall $40,000 or $50,000, and make a settlement with their creditors, and that the course that we had pursued had prevented them from doing so; that they thought they could settle with preferred creditors at 50 cents on the dollar, and with the other creditors at 25 cents. I asked them where they wanted to get the money, and they said from Rejall,—that Rejall would give them the money." This evidence does not seem to us to be

particularly substantial.    It does not necessarily seem to be indicative of fraud that the assignors hoped to make a settlement with their creditors by borrowing money to do so.

There may have been fraud in their plans in this respect, but the bare fact of their hoping to borrow money to make a settlement we do not think, in itself, particularly tends to indicate a fraudulent intent in making the assignment.    While this testimony may be incompetent and immaterial, it does not seem to us to have been of such a substantial character that the whole case should be reversed upon this ground.

Upon this point we append the following quotations:    "It then remains to be seen whether there was any such error in the decision of the judge who tried these issues, as to render it proper to grant a new trial.    And here it may be proper to observe that the principles upon which this court directs a new trial of a feigned issue are somewhat different from those which govern courts of law in granting new trials.    Where this court directs an action, although accompanied by particular directions, the parties in other respects are left to their legal rights.    The application for a new trial is in that case to be made to the court in which the action is brought, and is subject to the rules which govern the proceedings of that court in other cases.    But if an issue is directed, it is to inform the conscience of the chancellor, and the application for a new trial must be made here. (*Carstairs* v. *Stein*, 2 Rose 178; *Fowkes* v. *Chadd*, 2 Dickens 576; *Ex parte Kensington*, Coop. 96.) In the latter case this court will not grant a new trial merely on the ground that the judge received improper testimony on the trial of the issue, or that he rejected that which was proper, if, on the whole facts and circumstances, the chancellor is satisfied the result ought not to have been different if such testimony had been rejected in the one case or received in the other.    *Head* v. *Head*, 1 Sim. & S. 150; same case on appeal, Turn. & R. 142; *Barker* v. *Ray*, 2 Russ. 63; *Collins* v. *Hare*, 1 Dow & C. 139, per Lord Lyndhurst." (*Apthorp* v. *Comstock*, 2 Paige 487.) "The lord chancellor then observed, upon the doctrine of courts of equity as to new trials, that if evidence which ought

to have been received has been refused, or evidence which ought to have been refused has been admitted, or if, in some instances, the judge can be shown to have miscarried in his directions to the jury, the court will not grant a new trial, if, looking at the whole evidence before the jury and the address of the judge to the jury, its own conscience is satisfied.'' (*Head* v. *Head*, 1 Turn. & R. 141.)

"On the appeal to the general term from the original judgment, the order to be made would depend upon the extent to which, in the opinion of the court, errors had affected that judgment. If errors had been committed on the trial of the issues ordered to be tried by a jury, which so affected the result that the court was not willing to proceed to judgment thereon, a new trial would be necessary. But we apprehend that the court was not required to grant a new trial merely because it found on the record some exceptions which were well taken, if satisfied upon the whole case that justice had been done. This case, on the part of the defendant, upon the former appeal to the general term, and on the present appeal, has been treated and considered as though exceptions, if well taken, were to have the effect of reversing the judgment, however technical or unimportant to the general result they may be. Such effect was not given to mere errors on the trial of a feigned issue out of chancery, and it is not apparent that the Code has introduced a new rule on the subject. (*Forrest* v. *Forrest*, 6 Duer 138, 139; *Barker* v. *Ray*, 2 Russ. 63; *Lyles* v. *Lyles*, 1 Hill Eq. 82; *Mulock* v. *Mulock*, 1 Edw. Ch. 14, and cases cited; *Apthorp* v. *Comstock*, 2 Paige 482, and cases cited.) And the observation, gathered from these cases, that the trial of issues, and much more the proceedings on reference, being to inform the conscience of the court, even the rejection of competent testimony or the admission of incompetent evidence does not necessarily require the court to set aside the proceedings or grant a new trial, may properly be borne in mind in considering the objections heretofore to be noticed.'' (*Forrest* v. *Forrest*, 8 Bosw. 653.)

"It was insisted that the same principles upon which a court

of law formerly proceeded in granting or refusing a new trial should be applied to the case; and if evidence had been rejected on the trial of the issues that ought to have been received, or evidence received that should have been rejected, the defendant was entitled to a new trial. This is hardly the rule now in a court of law, for, latterly, even these courts undertake to judge for themselves of the materiality of evidence found to have been improperly admitted or rejected, and when satisfied that no injustice has been done, and that the verdict would have been the same with or without such evidence, they have refused a new trial. (*Doe* v. *Tyler*, 6 Bing. 561.) Courts of equity have, however, been governed by very different principles from those of a court of law, in granting or refusing new trials of issues of fact. Though evidence had been improperly admitted or rejected, if a court of equity was satisfied that the verdict ought not to have been different, it would not grant a new trial merely on such ground. (*Barker* v. *Ray*, 2 Russ. 63; *Lyles* v. *Lyles*, 1 Hill Eq. 82.) The object of a feigned issue is to satisfy the mind of the equity judge upon matters of fact, and that object is attained when the conscience of the judge is satisfied that, at the trial, justice has been substantially done. (*Mulock* v. *Mulock*, 1 Edw. Ch. 14; *Apthorp* v. *Comstock*, 2 Paige 483; *Collins* v. *Hare*, 1 Dow & C. 139; Id. 2 Bligh (N. S.) 106; *Bootle* v. *Blundell*, 19 Ves. 503; *Savage* v. *Carroll*, 2 Ball & B. 444; *Forrest* v. *Forrest*, 25 N. Y. 509.)

"Were this an action at law, the rulings of this court in admitting evidence would be subject to review, but, this being a chancery cause, a different rule prevails, and the inquiry here is whether or not the competent evidence in the record, taken in connection with the pleadings, sustains the decree that was entered." (*Sawyer* v. *Campbell*, 130 Ill. 166, 22 N. E. 464.)

Under these authorities, we are of the opinion that the unimportant and unsubstantial character of the evidence submitted is such that the whole case should not be overturned by reason thereof. It is apparent that the principal findings of

fraud may be sustained without this evidence, and it is difficult to understand that this evidence could have any substantial bearing upon the findings. We decline to reverse the case on this alleged error.

What we have said in the last paragraph as to the practice in equity in not reversing a case for unsubstantial errors, where it is perfectly clear that the result is correct, applies to several errors which the appellants have urged, and which we do not purpose to review in this opinion.

Again, it is contended by the appellants that it must be shown that the fraud was participated in by the assignee and by the creditors. As before remarked, the participation in the fraud by the assignee was found by the jury, and while the evidence is not wholly satisfactory upon that finding, we have felt that we are not in a position to disturb it. But as to the question of participation by the assignee and the creditors, we note section 229, div. 5, Comp. Stat. Mont., which is as follows : "Sec. 229. Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands or in goods in action, or of the rents or profits thereof, made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts or demands, and any bond or other evidences of debt given, suits commenced, decrees or judgment suffered, with the like intent as against the person hindered, delayed or defrauded, shall be void."

In order to exclude from the operation of this statute a purchaser for a valuable consideration, section 232 is as follows : "Section 232. The provisions of this chapter shall not be construed in any manner to affect or impair the title of ·a purchaser for a valuable consideration, unless it shall appear that such purchaser had previous notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor."

The statutes of the state of New York upon this subject are almost identical with ours. They are as follows: "Section 1. Every conveyance, or assignment, in writing or otherwise, of

any estate or interest in lands, or in goods or things in action, or of any rents or profits issuing therefrom, and every charge upon lands, goods, or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay or defraud creditors or other persons, of their lawful suits, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, decree or judgment suffered, with the like intent as against the persons so hindered, delayed or defrauded, shall be void." "Section 5. The provisions of this chapter shall not be construed, in any manner, to affect or impair the title of a purchaser for a valuable consideration, unless it shall appear, that such purchaser had previous notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor." 4 Rev. St. N. Y. (8th Ed.) pp. 2592, 2593.

Upon this statute the court of appeals of New York used the following language: "I conclude, therefore, that the judge would have pronounced the assignment void but for the additional fact that there was no fraud intended by the assignee. Having found that fact also, he held the assignment to be valid. If the decision turned, as it must have done, upon that fact, it was erroneous in point of law. By another section of the statute it is declared that 'the provisions of this chapter shall not be construed in any manner to affect or impair the title of a purchaser for a valuable consideration, unless it shall appear that such purchaser had previous notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.' 2 Rev. St. p. 137, § 5. I have no doubt that, under this statute the grantee in a conveyance which is fraudulent on the part of the immediate grantor may be protected, and that this section does not refer exclusively to derivative and subsequent conveyances of the same property. But an assignee in trust for the benefit of creditors is not 'a purchaser for a valuable consideration,' however innocent he may be of participation in the fraud intended by the assignor. The uprightness of his intentions, therefore, will not uphold the instrument, if it would otherwise for any

other reason be adjudged fraudulent and void." (*Griffin v. Marquardt*, 17 N. Y. 28.)

See, also, the following language from *Rathbun* v. *Platner*, 18 Barb. 272. "This charge cannot be sustained. The substance of the charge is that it matters not how fraudulent may have been this insolvent debtor's intent in making this general assignment, if his assignees are only free from all imputation of participating in his fraudulent designs, the assignment is to be upheld. The assignment is to be held good, notwithstanding this debtor may have made it with the express view to hinder, delay, and defraud his creditors, if the jury are only satisfied that the trustees whom he has appointed to carry out his fraudulent designs are free from the imputation of fraud themselves. The statute declares that every assignment, in writing or otherwise, of any estate or interest in lands, or in goods or things in action, etc., made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, etc., shall be void. 2 Rev. St. p. 137, § 1. The statute is that every assignment made with such intent shall be void. It was held by Chancellor Walworth, in the case of *Bank* v. *Atwater*, 2 Paige, 54, that a voluntary conveyance made by a debtor with the intention of defrauding his creditors is void, although the voluntary grantee was not privy to the fraud; and Assistant Vice Chancellor Sandford, in discussing Phillips' assignment (*Mead* v. *Phillips*), 1 Sandf. Ch. 85, which was a general assignment in trust for the benefit of creditors, says: "If Phillips made it with the intent to hinder, delay, or defraud creditors, it is void, although his assignees were perfectly honest and entirely ignorant of his designs.' Interests thus obtained through the fraud of the debtor cannot be sustained upon any principle known to the law. (*Haguenin* v. *Baseley*, 14 Ves. 289, 290; *Hildreth* v. *Sands*, 2 Johns. Ch. 42, 43.) Such assignments must be made in good faith, or they cannot be upheld. (*Russell* v. *Woodward*, 10 Pick. 408; *Burdick* v. *Post*, 12 Barb. 168, 172.) Our statute of frauds pronounces void all such assignments which are made with the intent to

hinder, delay, or defraud creditors, as we have already seen. The statute regards the intent with which the act was committed. (*Van Nest* v. *Yoe*, 1 Sandf. Ch. 9, 10; *Burdick* v. *Post*, 12 Barb. 172.) It declares void all assignments which shall be made with such fraudulent intent. (*Van Nest* v. *Yoe*, 1 Sandf. Ch. 10.) Our books are full of cases where sales have been declared void under the statute because of the fraudulent intent of the assignors in making them. (Id.) There are many cases where the late chancellor and vice chancellor have set aside assignments made by insolvent debtors in trust for the benefit of creditors, when the assignees have been perfectly free from the imputation of fraud; and it has been the settled rule in all such cases, when the assignees have acted in good faith, to protect and ratify their sales and acts done in good faith. (*Barney* v. *Griffin*, 4 Sandf. Ch. 552). It is claimed and insisted, however, that the case stated in the charge of the judge is governed by a different principle, inasmuch as the assignees themselves are to take the entire avails of the assigned property to pay their preferred debts, and consequently there will not in fact be any trust for them to execute for the benefit of the other creditors provided for in the assignment, and that the case falls within the principle and is governed by the rule of *Waterbury* v. *Sturtevant*, 18 Wend. 353, where a debtor had conveyed property directly to his creditor in payment and satisfaction of a *bona fide* debt, and the court upheld the conveyance, notwithstanding it was conveyed by the debtor with intent to hinder, delay, and defraud other creditors, because they found that the creditor was not a party to the fraud, but received the conveyance in good faith, in payment of an honest debt, applying the general rule which exists between vendor and vendee, mortgagor and mortgagee, pledgor and pledgee. (*Beals* v. *Guernsey*, 8 Johns. 348; *Wickham* v. *Miller*, 12 Johns. 320; *Jackson* v. *Terry*, 13 Johns. 471; *Jackson* v. *Myers*, 18 Johns. 425; Coote, Mortg. 421; *Wood* v. *Dixie*, 7 Q. B. 892; *Pickstock* v. *Lyster*, 3 Maule & S. 371; *Holbird* v. *Anderson*, 5 Term R. 235.) That rule has never been applied to a case like the present, so

far as my acquaintance with the books has extended, and I do not think that any case can be found where this rule has been applied to a case like the one under consideration.''

Again, in the later case of *Loos* v. *Wilkinson*, (October, 1888), we find the following language: ''If the assignment itself is for any reason fraudulent and void, it may be set aside, and then all power of the assignee under it ceases. An innocent assignee may not be permitted to act under a fraudulent assignment. The provision of law (3 Rev. St., 7th Ed., p. 2329) that every conveyance or assignment made with the intent to hinder, delay, or defraud creditors is void, is still in full force and operation, notwithstanding the act of 1858 and the various acts relating to voluntary assignments for the benefit of creditors. It may be that in a particular case an honest assignee may, under the acts referred to, undo all the fraudulent acts of the assignor preceding and attending the assignment, and the preparation of the schedules under it. Yet, if the assignment was made by the assignor with the fraudulent intent condemned by the statute, the assignment may be set aside at the suit of judgment creditors, and all powers of the assignee, however honest he may be, taken away. In assailing a voluntary assignment for the benefit of creditors, it is important only to establish the fraudulent intent of the assignor (*Starin* v. *Kelly*, 88 N. Y. 418), and when that has been established the assignment may be set aside, and creditors may then pursue their remedies and procure satisfaction of their judgments as if the assignment had not been made.'' (110 N. Y. 195, 18 N. E. 99.)

See, also, *Starin* v. *Kelly*, 88 N. Y. 418. See, also, the following remark by the supreme court of California : ''It is obvious, therefore, that the question upon which the case must turn is whether the conveyance was in fraud of the rights of the plaintiff as a creditor. This, under our statute, is a question of fact (Civil Code, § 3442); that is to say, a question of intent. And since the deed was without consideration, the intent which is material is that of the grantor. It is immaterial how innocent the grantee was. (*Lee* v. *Figg*, 37 Cal.

336; *Peek* v. *Peek*, 77 Cal. 111; 19 Pac. 227; *Swartz* v. *Haz-lett*, 8 Cal. 128." *Judson* v. *Lyford*, 84 Cal. 508.)  We are of the opinion that our statute, as we have recited above, and the constructions given to the same statute by courts of the state of New York, is conclusive upon this subject.  A general assignment for the benefit of creditors is not a conveyance to a purchaser for a valuable consideration, and for that reason the fraud by the assignors is sufficient to avoid the assignment.  See cases last cited; also, *Farrington* v. *Sexton*, 43 Mich. 456, 5 N. W. 654, and *Chace* v. *Chapin*, 130 Mass. 131.

Again, the appellants contend that the secretion of the assets by assignors is the only ground of fraud in this case, and that such secretion is not sufficient to avoid the assignment. Upon this point they cite cases holding that the application by the assignors of some of their assets to debts, which application was made before the general assignment, was not fraud sufficient to avoid the general assignment. But that is not at all this case.  The assignment purports to be a general one of all the property of the assignors, and it is far from the fact that the secretion of the assets is the only evidence of fraud relied upon.  In this case the secretion of the assets was not wholly for the purpose of paying debts due by the assignors, but such secretion was part of the evidence and findings showing fraudulent intent in the assignment.

The appellants also contend that there was error in admitting in evidence, upon the trial of this case, the judgment roll in the money-demand action of the bank against Greenhood, Bohm & Co.  But the objection which they urged in this court was not made in the court below, by reason of which that court had no opportunity to pass upon the matters which are now urged.

Appellants also contend that the court erred in allowing certain amendments to the plaintiff's complaint.  We have examined this matter, and are satisfied that there was no abuse of discretion in allowing those amendments.

The appellants have also called the attention of the court to

the case of *State ex rel. New York Sheep Co.* v. *Eighth Judicial District Court*, 14 Mont. 577, upon the question of the appointment of a receiver in the case at bar.    That case is wholly distinguished from this one, as a reading of the decision will make apparent.    That case was a simple money-demand action, with an attachment as ancillary thereto, and it was held that the statute did not provide for a receiver in such case. The case at bar is an equity action seeking the equitable relief of setting aside an assignment alleged to be fraudulent.

We have now reviewed all of the errors which were relied upon by the appellants, and which we regard as of sufficient importance to demand a treatment in this opinion.    We are satisfied that there is nothing in the case which demands its reversal.

We will refrain, at the close of this long discussion, from giving a *resumé* of the various findings of the jury, upon which the court determined that the assignment should be set aside. We refer to the elaborate statement of the case preceding this opinion.    We are satisfied, as was the district court, that those findings are sufficient to set aside the assignment, and we are also satisfied that the judgment entered by the district court was correct.    The trial in that court was a long, patient, and laborious one.    As shown above, both of the learned judges of that court presided, and, as they inform us, they had an unusually intelligent jury.    From a perusal of the findings of that jury, we are satisfied as to their intelligence and good judgment.

Inquiries into alleged fraud are always difficult and tedious. We cannot but conclude, upon our own laborious review of this case, that the same was fairly tried and the result fairly reached.    The appellants had the benefit of an array of counsel drawn from the ranks of the ablest members of the bar of the county.    They presented every merit and every technicality of their case.    We cannot close this opinion without expressing our appreciation of the earnest and able labors of all the counsel engaged in this case.    No diligence and no learning has been spared.    Some of the questions involved were

first impressions in this jurisdiction, and we have felt the importance of arriving at a conclusion that would satisfy ourselves. It is most gratifying to have our labors lightened by the high order of learning which has been exhibited in the arguments and briefs of counsel.

We are satisfied of the result which we have reached, and therefore order that the judgment as rendered and entered be affirmed.

*Affirmed.*

PEMBERTON, C. J., concurs. HUNT, J., having tried the same as district judge, does not participate in the decision.

## ON REHEARING.

PER CURIAM.—In this case a motion for rehearing has been filed and submitted. The appellants ask for a rehearing, in order that they may argue an objection to the judgment as entered in the lower court. The objection which they suggest to the judgment is only as to a portion of the same. This objection is now made for the first time. The record in this case was on file in this court for 17 months before the appeal was heard. The counsel filed briefs covering nearly 400 printed pages. On the argument we extended the time, and gave counsel more than twice as much time for argument as the rule prescribes. With all this time which counsel had to prepare the case, and with the extraordinarily voluminous briefs that were filed, and with the unusual time given to the arguments, counsel never suggested that there was the slightest error in the entry of the judgment below. We are not prepared to say that we would never grant a rehearing upon a point that was presented for the first time on the motion for such rehearing, but, under the extraordinary circumstances of this case, we do not feel that we are called upon to entertain the motion. The point presented now is wholly new, and we do not know that it is of great importance. There has been the amplest and the fairest opportunity for counsel to present

everything upon which they relied.   The remittitur even was sent to the lower court, under rule 15 (13 Mont. 577), and was recalled to await the determination of this motion.   As to such matters this court said, in *Mining Co.* v. *Holter*, 1 Mont. 429:   ''A rehearing will not be granted in an equity cause after it has been remitted to the court below to carry into effect the decree of the court above according to its mandate.''

Again, the court said in *Davis* v. *Clark*, 2 Mont. 394: ''This case is before us upon motion of appellant for a rehearing.   In considering the questions which have been submitted, we must be governed by the rule established in *Mining Co.* v. *Holter*, 1 Mont. 432.   The decisions of this court will not be reversed unless they are in conflict with a statute or controlling decision, to which the attention of the court has not been directed, or it appears that some question which is decisive of the case has been submitted by counsel, and been overruled by the court.''

In the case of *Beck* v. *Thompson* (Nev.) 41 Pac. 1, the court said:   ''All the points raised in the petition, except as to the rent, are new matters, and, under the decisions of a long line of authorities, they should not be considered on petition for rehearing.   'A rehearing in the supreme court will not be granted in order to consider points not made in the argument upon which the case was originally submitted.' (*Kellogg* v. *Cochran,* 87 Cal. 192.)   'The supreme court will not consider a petition for rehearing that attempts to discuss the case upon grounds which were not presented in the original argument or discussed in its opinion.' (*San Francisco* v. *Pacific Bank*, 89 Cal. 23.)   'New questions cannot be raised for the first time on motion for rehearing.' (2 Enc. Pl. & Prac. 386, and authorities cited in note 1.)   'Counsel are presumed to have presented on their original argument all the grounds upon which they rely for the affirmance or reversal of the judgment appealed from.' (Id., and note 2.)   We fully concur with the above-named authorities.   A rehearing is denied.''

In the note to 2 Enc. Pl. & Prac. cited by the Nevada court,

the author cites the following cases: *Robinson* v. *Allison*, (Ala.) 12 South. 604; *Bank* v. *Ashmead*, 23 Fla. 391, 2 South. 657, 665; *Jacksonville, etc., Ry. Co.* v. *Peninsular Land, etc., Co.*, 27 Fla. 1, 157, 9 South. 661; *Funk* v. *Rentchler*, 134 Ind. 68, 33 N. E. 364, 898; *Martin* v. *Martin*, 74 Ind. 207; *Lawrence Co.* v. *Hull*, 70 Ind. 477; *Yates* v. *Mullen*, 24 Ind. 277; *Graeter* v. *Williams*, 55 Ind. 461; *Rickhoff* v. *Machine Co.*, 68 Ind. 388; *Heavenridge* v. *Monday*, 34 Ind. 28; *Brooks* v. *Harris*, 42 Ind. 177; *Cramer* v. *City of Burlington*, 45 Iowa 630, *McDermott* v. *Railway Co.*, 85 Iowa 180, 52 N. W. 181; *Dietlin* v. *Eagan* (Com. Pl.) 2 Misc. Rep. 52, 21 N. Y. Supp. 6; *Moore* v. *Beaman*, 112 N. C. 558, 17 S. E. 676; *Hudson* v. *Jordan*, 110 N. C. 250, 14 S. E. 741; *Weld* v. *Manufacturing Co.*, 84 Wis. 537, 54 N. W. 335; *State* v. *Coulter*, 40 Kan. 673, 20 Pac. 525; *Weathersbee* v. *Farrar*, 98 N. C. 255, 3 S. E. 482; *Lovenberg* v. *Bank* (Tex. Supp.), 5 S. W. 816; *Schrichte* v. *Stite's Estate*, 127 Ind. 472, 26 N. E. 77; *Lawrence Co.* v. *Hall*, 70 Ind. 469; *Bitting* v. *Ten Eyck*, 82 Ind. 421; *Coleman* v. *Keels*, 31 S. C. 601, 9 S. E. 735; *Underwood* v. *Sample* 70 Ind. 450; *Porter* v. *Choen*, 60 Ind. 388; *Railroad Co.* v. *Huff*, 19 Ind. 315; *Kellogg* v. *Cochran*, 87 Cal. 192, 25 Pac. 677; *San Francisco* v. *Pacific Bank*, 89 Cal. 23, 26 Pac. 615; *Farrell* v. *Pingree*, 5 Utah 530, 17 Pac. 453; *Rogers* v. *Laytin*, 81 N. Y. 642; *News Co.* v. *Wilmarth*, 34 Kan. 254, 8 Pac. 104; *Knoth* v. *Barclay*, 8 Colo. 305, 6 Pac. 924; *Whitehead* v. *Tulane*, 11 La. Ann. 302; *Broom's Succession*, 14 La. Ann. 67.

We feel that it is the proper practice to deny this motion for rehearing. With all the diligence and labor in preparing and arguing this appeal, there is nothing whatever to indicate to us any excuse for counsel not having fully presented their points. We heard counsel at length, we studied their briefs at length, and deliberated over their case for many weeks; and, under all these circumstances, we are now of opinion that as to this case "*interest reipublicœ ut finis litium sit.*" A rehearing is denied.

                                                    *Denied.*